[Crim. No. 4125.   In Bank.—April 19, 1938.]

THE PEOPLE, Respondent, v. DAVE ROSEN, Appellant.

A. H. McConnell for Appellant.

U. S. Webb, Attorney-General, and Paul D. McCormick, Deputy Attorney-General, for Respondent.

THE COURT.—The defendant was charged by information with having committed the crime of robbery by feloniously taking from one Paul W. Whitcomb the sum of $198, accomplished by means of force and fear. The defendant was also charged with having been armed at the time with a deadly weapon. He was tried on his plea of not guilty and convicted of robbery in the first degree. He appealed from the judgment of conviction and from the order denying his motion for a new trial.

This is a case where admittedly the defendant is guilty of the crime of assault with a deadly weapon. The question is whether he had the right to have the jury pass upon his defense interposed to the charge of the crime of robbery.

It is undisputed that the defendant, at about half-past eleven o'clock on the night of December 19, 1936, took the sum of $198 from a tin box kept in the rear room of Whitcomb's clock shop in the basement of the Jergins building in Long Beach; that the defendant was then armed with a pistol, and that he accomplished his purpose by putting Whitcomb in fear. The grounds of the appeal are (1), that the court refused to admit evidence offered in support of the defense that the taking was under a *bona fide* claim that the property taken belonged to the defendant and that the felonious intent necessary to complete the crime of robbery was therefore lacking; (2) that the court refused to instruct the jury upon the theory and proffered evidence of such defense; and (3) that the court failed to instruct the jury on the law applicable to the crime of assault with a deadly weapon, such a crime having been established by undisputed evidence, including the admission of the defendant.

Across the hall from Whitcomb's clock shop a place called "Miller's Tango Parlor" was in operation. During several

months prior to the date of the alleged offense the defendant had frequented Miller's and during that period had lost in all about $1,000. He had played the game of "tango" at Miller's on the night in question and lost about $55. The court refused to receive the defendant's proffered testimony that the game of tango was a gambling or lottery game and illegal under the laws of this state. However, it appeared from the admitted evidence that in such a game the player purchased from the operator a number of cards at ten cents each, the price being collected before the commencement of the game. Cash prizes were paid to the holders of winning cards. Under the method of "pay-off" the holders of winning tickets were required to cash them by presenting them to Whitcomb, who deducted four per cent as a discount charge. Whitcomb moved back and forth between the parlor and his shop and carried money from the former to the latter, sometimes in loose bills and at other times in a tin box. He kept a separate fund in the box at his shop from which he paid the winners. It was from that box that the defendant took the sum of $198, which was its entire cash contents.

Upon his apprehension the defendant made a statement to one of the arresting officers that he had lost all he had at Miller's; that he was merely going to get back his own money, and that he would have taken more had there been any more, because he had lost about $1,000 at Miller's over a period of six months.

The Penal Code, section 211, defines robbery as the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear. Robbery perpetrated by being armed with a dangerous or deadly weapon is robbery in the first degree and is punishable by imprisonment in the state prison for not less than five years. (Secs. 211a and 213, Pen. Code.) ▮ Section 20 of the Penal Code provides that in every crime or public offense there must exist a union or joint operation of act and intent. This requirement of union of intent and act has led to the uniform rule in robbery cases that there can exist no felonious intent when the owner takes his own specific property from the possession of another, even though the taking is under such circumstances as would constitute robbery if the possessor were the owner thereof. (*People* v. *Vice*, 21 Cal. 344, 345; *People* v.

*Ammerman,* 118 Cal. 23 [50 Pac. 15]; 22 Cal. Jur., p. 841; *Johnson* v. *State,* 24 Okl. Cr. 326 [218 Pac. 179]; *People* v. *Hughes,* 11 Utah, 100 [39 Pac. 492]; *State* v. *Brill,* 21 Idaho, 269 [121 Pac. 79]; *Triplett* v. *Commonwealth,* 122 Ky. 35 [91 S. W. 281]; *Glenn* v. *State,* 49 Tex. Crim. Rep. 349 [92 S. W. 806, 13 Ann. Cas. 774, 775], and cases cited in note; *Temple* v. *State,* 86 Tex. Crim. Rep. 219 [215 S. W. 965]; note, 135 Am. St. Rep., p. 485.) ▮ While there appears to be a conflict of authority on the question whether felonious intent is present when the defendant seeks the recaption of money lost by him at an illegal game (note, 135 Am. St. Rep., pp. 485–489), the weight of authority supports the conclusion that the intent to steal is lacking in such a case, for the law recognizes no title or right to possession in the winner. It is the law in this state that certain games of chance, such as lotteries, are illegal; that the winner gains no title to the property at stake nor any right to possession thereof; and that the participants have no standing in a court of law or equity. (*Gridley* v. *Dorn,* 57 Cal. 78 [40 Am. Rep. 110]; *Bank of Orland* v. *Harlan,* 188 Cal. 413, 421 [206 Pac. 75]; 16 Cal. Jur., p. 716.) In jurisdictions where such is the state of the law the weight of authority appears to favor the view that the recaption by force or fear of money lost at illegal games is not robbery, although the act may be punishable as an unlawful assault or trespass. (*People* v. *Hughes, supra; Thompson* v. *Commonwealth,* 13 Ky. Law Rep. 916 [18 S. W. 1022]; *Sikes* v. *Commonwealth,* 17 Ky. Law Rep. 1353 [34 S. W. 902]; *Gant* v. *State,* 115 Ga. 205 [41 S. E. 698]; *State* v. *Price,* 38 Idaho, 149 [219 Pac. 1049, 35 A. L. R. 1458], and note at p. 1461; notes, 57 L. R. A. 443; 13 Ann. Cas. 775; 21 Ann. Cas. 1139; 40 L. R. A. (N. S.) 805, 806.) The courts recognize that in such a case, whatever other element of crime may be present, there cannot exist an intent to steal or take feloniously the property of another, which is an essential element of the crime of robbery. In *People* v. *Hughes, supra,* it was said: ''In all criminal cases the question of intent is an important one. If this element is lacking, the general rule is that no offense has been committed. This rule is not only humane, but a contrary one would be opposed to all the principles which underlie human conduct as respects the bearing of individuals towards each other, and also as regards their position towards

the state. And so the law is that, when evil intent is lacking, the act or omission, which otherwise would constitute an offense, is robbed of its criminality. The rule governing this class of cases seems to be well settled and thoroughly defined. In a note in 70 Am. Dec. 188 (*State* v. *McCune*), where a number of authorities are collected, this proposition is laid down: 'When the prisoner takes the property under a *bona fide* impression that the property belongs to him, he commits no robbery, for there is no *animus furandi*'. . . . The defendant in all cases is entitled to have the law governing his case given to the jury for their guidance, and in this case the question of honest belief and *bona fide* intention should have been submitted to and passed upon by the jury under proper instructions.''

It has been suggested that the decisions which hold that felonious intent is lacking when the accused retakes money lost at illegal gambling, are based on statutory law which gives a right of action to the loser to recover the money lost. (Note, 42 A. L. R., p. 742.) The law of Texas and Michigan appears to be consistent with that theory. (*Blain* v. *State,* 34 Tex. Crim. Rep. 448 [31 S. W. 369]; *People* v. *Henry,* 202 Mich. 450 [168 N. W. 534].) The decisions in Texas holding that the act is robbery are based on the absence of any statute giving legal redress. In Michigan it is held that such retaking does not constitute robbery because the loser is entitled to recover in an action in assumpsit or replevin. That view, however, does not necessarily form the exclusive basis upon which a charge of robbery has failed. A further basis appears to be that, where the winner obtains no valid title or right to possession of the money won (*State* v. *Price, supra; Thompson* v. *Commonwealth, supra*), the loser cannot have a felonious intent in taking it. The view which seems to be consistent with the declared policy in this state is that the complaining witness, being in a sense *in pari delicto* with the accused, should not be heard in a court of justice on a charge of robbery against one whose only purpose was to retake money lost at an illegal game. This view neither condones nor invites the commission of crime, inasmuch as the accused must pay the penalty for the violation of any applicable penal law.

It has also been held that in resisting the charge of robbery by a showing that the intention was the recaption

of money lost at an illegal game, it is not incumbent upon the defendant to prove that the money reclaimed was the identical money won from him. (*Sikes* v. *Commonwealth, supra; Gant* v. *State, supra*.) However, the accused must intend in good faith to retake his own property. The question of intent is one for the jury which may find, if the facts justify it, that the defendant's expressed intent was a mere pretext resorted to as a cover for an intent to steal. (*Crawford* v. *State*, 90 Ga. 701 [17 S. E. 628, 629, 35 Am. St. Rep. 242].)

■ It follows that the trial court should have admitted evidence on the question of the legality of the game at which 'the defendant lost money, and should have given instructions requested by the defendant consistent with the views herein expressed. The jury should have been permitted to consider the question of the defendant's intent as disclosed by all the evidence, including that offered and rejected. (*People* v. *Keefer*, 65 Cal. 232 [3 Pac. 818] ; *State* v. *Brown*, 104 Mo. 365 [16 S. W. 406].) It was for the jury to determine whether Miller operated an illegal game at which the defendant lost sums of money; whether Whitcomb was the agent of the operator and handled the funds collected in the conduct of the game; whether the money taken by the defendant consisted of winnings from the parlor; whether the defendant's expressed intent to get back his own money ·was *bona fide* or, because of remoteness from the time of loss or for any other reason, it was merely a pretext for an act of robbery.

■ The court did instruct the jury on the necessity of the union of act and felonious intent and in addition that "one cannot be guilty of robbery where the property taken belonged to him, even though the taking is accomplished by force or fear". But the failure to instruct further on the theory of the defense that it was the defendant's *bona fide* belief that the money was his own constituted prejudicial error on the record here presented.

The judgment and the order denying the motion for a new trial are and each is reversed.

SEAWELL, J., Dissenting.—I dissent.

The law of this state shuts the door against those who voluntarily stake their money on gambling with cards and games commonly known as games of chance, whatever be the

form or device used by the parties who mutually engage in gambling transactions. Courts will not act as referee as to the fairness of the methods of gaming or attempt to balance the *bona fides* of such unlawful ventures between parties who voluntarily stake their money or property on the hazard of chance, or as to wagers made by persons as to which one is the most skilful in the movements of the hands or other kinds of deception, whether the game is played with cards or by the manipulation of mechanical devices.

To hold that a loser gambling at games or wagering on the results of chance would be privileged to return to the gambling rooms where he had lost his stakes or recapture his losses at any place where he might meet the person he had gamed with, and, by force of arms, recoup his losses, would throw wide open the door to those criminally inclined to engage in robbery in its most dangerous form in the guise of recapturing stakes lost at some form of gambling or chance, without incurring the penalty prescribed for the offense of robbery. Such a defense could be made in every borderline case where the character of the transaction might be less marked than in the instant cases which bears some resemblance to a large number of nationwide transactions not infrequently referred to as gambling ventures. The recognition by law of the policy contended for would have the direct effect of menacing life by encouraging violence and breaches of the peace. It would offer a tempting subterfuge behind which gunmen would find convenient if not ample protection. The rule would open a new field for the operations of the criminal minded. We see no legal or moral strength on the side of appellant. He voluntarily parted with the possession of his money by matching his cunning with that of another. He lost and possession passed to the winner. He had no title which the law would protect. The law has no interest in the question of title as between the parties, but it does have an interest in the preservation of the life and limb of its citizens and in the maintenance of peace and order. That is its first duty. This being so, why, particularly where the actor, by his own folly, is responsible for the situation in which he has placed himself, should the law encourage or lend its approval to the commission of breaches of the peace? If the law will not aid him in the recovery of that which he has voluntarily parted with, how can it be said that he has

a legal right to rise above it and assume the role of an outlaw in recovering possession by force of arms?

The cases in which a purse is snatched from the hands of a bystander and the victim makes a recovery of his specific property, or where a thief steals an animal and recovery is made by the owner from the pasture or possession of the thief, are not comparable with the situation presented by the instant case. The distinction as to the means of possession is too apparent to require more than bare mention. In the first instance possession is gained by theft or by the exercise of fear or force. In the examples cited, the owner did not voluntarily part with possession; in the instant case, he did. This marks an important distinction in two widely different situations. Under the doctrine contended for, the loser at a game of chance, without regard to time or place, could continue his acts of prey under the sanctity of law and could appropriate unidentified moneys in which he has no title of sufficient stability to support his claim in an action at law until the last penny, with or without interest, has been made good.

There is no merit in the claim that this species of violence would have a tendency to suppress gambling. The laws which are designed to prohibit that evil, if properly enforced, are sufficient for that purpose. The nostrum administered to improve an unwholesome condition would have a more deleterious effect on the body politic than the evil which is remedial upon the enforcement of laws already written into our statutes.

The holding that stakes lost at the gambling table may at any time or place thereafter be retaken at the point of arms, thereby stripping an important section of the Penal Code of its deterrent force in such cases, portends the danger that such pronouncement will tend to increase lawlessness by holding out hope of immunity to persons criminally disposed, and perchance act as an urge to others who, finding themselves driven to the brink of tragic depths by the disappointing turn of fortune, will be tempted to recoup such losses by embracing the desperate hazard of forcibly taking property from the person of another. If the loser in his attempt to take from the person whom be believes has in his possession money allegedly won from him—moneys, it may be, which are held in trust for another—and the latter resists the at-

tempted search and seizure of his person which has all the appearances of an attempted robbery, and a homicide is thereby committed by one or the other—by no means a remote possibility—an interesting and vexatious question would arise as to the legal rights of either under the law of excusable or justifiable homicide.

In the confused situation in which the defense of person and property would be thrown by extending the rule as approved by the main opinion, it may be pertinent to ask what should be the measure or standard as to the *quantum* of force which either party may be entitled to exert in the struggle, first, with respect to the enforcement of the demands made by the known or disguised assailant, and, secondly, as to the resistance of an act which has every appearance of an ordinary robbery.

A voluntary participant in a game of chance has no title in or right of possession of personal property which the law recognizes after it has passed from the possession of one wagerer into the possession of the other. A creditor in legitimate business transactions is not given the privileges and immunities which the main opinion would bestow on persons who seek to recoup gambling losses.

I perceive no real reason or moral requirement for the adoption of a rule which will have the effect of throwing confusion into well-settled rights of person and property. In cases where it appears that there are mitigating circumstances which weigh in a defendant's favor there is scarcely a doubt, under our humanized administration of the criminal law, but that the defendant would be released from a prison sentence by an order admitting him to probation, at the termination of which, if his conduct merits it, the entire proceeding is expunged from the court's records. In addition, he has a right to apply to the executive head of state government for executive clemency, which is uniformly granted in proper cases.

I am of the view that the rule contended for by appellant would prove to be inimical to the enforcement of law and the maintenance of order, and the doctrine which the main opinion approves would tend to enlarge the field of crime and incite disorder rather than restrict it.

Langdon, J., concurred.