[Crim. No. 1807.    Third Dist.    Feb. 13, 1943.]

THE PEOPLE, Respondent, v. QUINTON LAIN, Appellant.

George T. Davis and Joseph P. Lacey for Appellant.

Earl Warren, Attorney General, and J. Q. Brown, Deputy Attorney General, for Respondent.

SCHOTTKY, J. pro tem.—Appellant was convicted on two counts, count one being assault with a deadly weapon, and count two being robbery in the first degree. This appeal is from the judgment and also from the order denying appellant's motion for a new trial.

Appellant urges numerous grounds for a reversal of the judgment. In order that our discussion of the various points raised may be better understood, we will give a fairly complete summary of the facts, as shown by the record.

The appellant was a tavern owner in the city of Woodland. On April 2, 1941, one James Bailey, the complaining witness on the robbery count, met appellant at a poolroom

in Woodland. The meeting occurred about 6:30 p. m., and appellant suggested to Bailey that they should have a drink, and that they should then go to appellant's tavern, where appellant would call up some people for the purpose of having a poker game. Bailey agreed to the suggestion. Bailey's wife then came along, and Bailey asked her for a $100 bill, stating that they were going to have a good game, and that he would not be home until late. Before they left the pool-room, one Dorsey Childers was asked by appellant to have a drink, and several drinks were purchased there, Bailey himself buying one. Appellant informed Bailey that Childers would take care of the poker game. Appellant, Bailey and Childers then got into appellant's car and went to appellant's place of business known as the Del Mar Bar. Upon arrival there appellant called up one Mr. Whitehead on the telephone and invited him over, and appellant sent Childers out to buy some cards and get some change. When Whitehead came in, he and appellant and Bailey had some drinks, and appellant told Whitehead they were to have a card game, and appellant, Childers, Whitehead and Bailey went into the kitchen, which was in a room behind the west end of the bar, but separated entirely from the main barroom, and they immediately began to play stud poker.

In order that the physical situation may be better understood, we will give a brief description of the premises where the difficulty took place.

The barroom is approximately 40 feet long from east to west, and is approximately 19 feet wide. The main entrance to the barroom is from Third Street on the east. Along the south wall of the barroom are located the dressing-rooms for ladies and men, and some booths, the booths being opposite the bar which is 21 feet and 8 inches long, and which is located near the west end of the barroom. Between the west end of the bar and the west wall is a lift, which is raised in order to get behind the bar, the distance from the west end of the bar and the west wall being approximately 2½ feet. The distance from the north side of the booths to the bar is approximately 7½ feet. According to the evidence there were a row of stools in front of the bar. Leading back from the lift to the north wall of the barroom in the northwest corner thereof, is a door which leads into a small pass-hallway which leads into the kitchen where the gambling game took place. From the lift to the door leading into

this hallway is a distance of approximately 7 feet from the lift at the west end of the bar. In the west wall of the barroom proper is a door leading into the lobby of the Del Mar Hotel.

About an hour after the game started, one Jesse D. Dutcher joined the game, entering the kitchen through the same door in the barroom through which the others had entered. Before Dutcher entered the game, Childers left, because Childers got into an argument with the defendant, and the defendant ran him out. These parties continued to play stud poker until about 1:45 a.m. the following morning. Drinks were occasionally served during the game. Bailey won about $65. There was no dispute or argument between Bailey and appellant during the game. Appellant quit the game about 1:15 a.m. Another party named Joseph Jungbluth played in the game for a short while. One John Hendrix, a nephew of appellant and a bartender in the main bar premises, was occasionally in and around the kitchen during the course of the game.

Shortly before the game broke up, Bailey informed the others that he was going home, and thereupon stood up. Hendrix invited Bailey to have a drink and Bailey went into the bar premises proper. Appellant had already been in the barroom prior to this entrance of Bailey. Jungbluth also came into the barroom. Bailey walked over to a stool near the bar. Appellant accused Bailey of cheating and told him to put "that money on the bar." Bailey denied that he had been cheating, and stated that he had won the money fairly. About that time Jungbluth struck Bailey in the mouth with his fist, knocking Bailey over against a booth in the barroom. Bailey got up and walked back toward the bar, and was all bloody, and some of his teeth were gone, and told them they "did a Hell of a thing in knocking out his teeth." The appellant spoke up, saying something about they "should have done more than that," so the complaining witness became scared and tried to get out. He could not get through the door to get out, and in the meantime defendant kept telling him to put the money up on the bar or he would take it away from him. Bailey then put $115 on the bar, testifying that he did so because he was scared. Later on in the evening and upon his return to said premises in company with a police officer, he put an additional $10 on the bar. Bailey testified that John Hendrix, the bartender,

counted the money. Bailey also stated that he retained the $100 bill that he had previously received from his wife, keeping this bill in his shoe. He claimed to have $57.50 besides this $100 when he entered the poker game.

When Bailey put the money on the bar, Jungbluth, Hendrix and Bailey were in the bar premises. Jungbluth then left. Bailey testified that appellant then asked him where the $100 bill was, and then urged him to put that bill on the bar also. Bailey then ran for the door, and appellant grabbed him, and according to Bailey, started choking him. Bailey then "hollered" for help. While defendant was choking Bailey, someone in the hallway separating the kitchen, where the card game had taken place, from the main bar premises, rapped at the door leading from said hallway to the barroom. Hendrix came over and told appellant to quit choking Bailey, and pulled him off. Appellant then went from the front of the bar where Bailey was, through a lift at the west end of the bar to the door behind the bar leading into the hallway, and said to whoever was on the other side of the door, "Get the Hell away from there or I will start shooting through it." And Bailey testified that he then for the first time saw a gun in appellant's hand, and appellant was then standing close to the door and started shooting through it. When the shooting started, Bailey took advantage of his chance to get out, and got out through the door from the west end of the barroom, and ran through the lobby, and as he passed the bar he grabbed the sum of $6.25 in silver off the bar. Bailey ran down the street, meeting police officers, and then returning with them to the bar premises. En route they met Hendrix, who accompanied them to the barroom. Appellant was in the barroom when they entered, and appellant again accused Bailey of cheating. Bailey said he wanted his money back. Hendrix had the money in the pocket of his jacket. Appellant then informed the officers that there had been a little trouble, and Hendrix proceeded to tell the story of the occurrences. Appellant then put the money on the bar and Bailey added an additional $10 from the sum in his pocket. The moneys were then separated in the presence of the officers, Bailey being given $57.50, (the amount with which he started the game), for his share, and Hendrix, the balance. Bailey testified that he did not know how much money Whitehead had lost, or

how much Dutcher or Jungbluth had lost. The evidence shows also that appellant and Bailey had previously been in a card game in Woodland, appellant having lost $400 in the said game, and Bailey having won $200.

Bailey testified that before the game started they were all drinking pretty fast. Each person had about seven or eight drinks at least. Bailey stated that the way some of them drank on that evening, it was pretty hard to keep up with them. The testimony is undisputed that appellant was badly intoxicated on that evening, and the district attorney conceded this fact in his opening statement to the jury. Bailey also testified that he was choked by appellant after he had put the money on the bar, and that five or seven minutes elapsed from the time Jungbluth struck him until he left the premises, and that appellant did not touch him until a minute or two before he left the premises. Bailey also testified that during the time that appellant was choking him he heard someone say, ''Open the door or I will break it down.'' Bailey further testified that before he put the money on the bar Hendrix also urged him to put it there,— Hendrix at the time stating that they would count it..

Joseph Jungbluth was called a prosecution witness, and testified that he also accused Bailey of cheating; that Bailey made some kind of a move, and that he thereupon struck him. Jungbluth also testified that Hendrix urged Bailey to put the money on the bar in order that the money might be counted. He stated that the money was then put upon the bar by Bailey. Jungbluth left before the shooting occurred.

Childers, who was also called as a witness for the prosecution, testified that appellant was pretty well intoxicated about 8 o'clock that evening.

Whitehead was also called as a witness for the prosecution. He testified that he lost $30 in the game. Whitehead was out in the hallway separating the bar and the kitchen, during the scuffle between appellant and Bailey.

Dutcher, also a prosecution witness, testified that he was in the hallway at the time Whitehead was there. Dutcher banged on the door. Dutcher testified that Bailey wound up with most of the money, and that when Bailey went into the bar premises, he stayed in the kitchen with Whitehead; that he heard some noise, and said, ''Let's get out of here.'' He went from the kitchen to the door separating the bar door.

He stated that one Murphy and Elmer Snyder were there at that time, and that he, Dutcher, demanded that the door should be opened up or that he would kick it down, and that he kicked the door several times, and that the shooting thereupon occurred. He also stated that at the time he heard the shots he was getting ready to break the door down. Dutcher was shot in the right ankle and in the calf of the left leg.

One Fred Ewert, a deputy sheriff, testified that the bullets hit about three inches from the floor just about the baseboard on the wall opposite the door separating the hallway in the main bar premises. This hallway was about 3 feet wide. He further testified that one of the bullets entered the door about 30 inches from the floor, two other bullets entering the door about 2 or 3 inches below that.

The statement of appellant given to the district attorney was read into the evidence, and in it appellant stated that he tried to quiet Bailey after Jungbluth had knocked him down, and that he belived that someone was trying to break down the door, and that appellant shot into the door to scare such person, to keep him from breaking down the door, and that he intended only to shoot through the floor.

Murphy, the police officer, testified that the bullets went through the door at a forty-five degree angle; that there were three shots fired, and that appellant told him that he merely shot to scare the person away who was trying to break down the door. The officer saw the gun lying on the back bar when he entered the bar premises on that evening.

Elmer Snyder, a defense witness, testified that he was in the hallway alongside Dutcher at the time of the shooting. He stated that Dutcher said he would "break the damned door down." He also stated that Dutcher backed himself against the wall and started kicking the door. He heard appellant say, "Get away from the door and don't break it down." He heard appellant say this five or six times.

Appellant's first contention is that "appellant having only sought the return of moneys lost in an illegal card game, his conviction of robbery is contrary to law." In support of this contention appellant relies strongly upon the case of *People* v. *Rosen*, 11 Cal.2d 147 [78 P.2d 727, 116 A.L.R. 991]. In the Rosen case it is undisputed that the defendant, while armed with a pistol, took the sum of $198 from a tin-box in the possession of one Whitecomb, by put-

ting Whitecomb in fear; and also, that during several months prior to the date of the alleged offense, the defendant had frequented the gambling place conducted by Whitecomb, and had lost the sum of about $1,000, and that on the night in question he had lost about $55. In reversing defendant's conviction on the charge of the robbery, our Supreme Court said:

"The Penal Code, section 211, defines robbery as the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear. Robbery perpetrated by being armed with a dangerous or deadly weapon is robbery in the first degree and is punishable by imprisonment in the state prison for not less than five years. (§§ 211a and 213, Pen. Code.) Section 20 of the Penal Code provides that in every crime or public offense there must exist a union or joint operation of act and intent. This requirement of union of intent and act has led to the uniform rule in robbery cases that there can exist no felonious intent when the owner takes his own specific property from the possession of another, even though the taking is under such circumstances as would constitute robbery if the possessor were the owner thereof. (*People* v. *Vice,* 21 Cal. 344, 345; *People* v. *Ammerman,* 118 Cal. 23 [50 P. 15]; 22 Cal. Jur., p. 841; *Johnson* v. *State,* 24 Okla.Cr. 326 [218 P. 179]; *People* v. *Hughes,* 11 Utah 100 [39 P. 492]; *State* v. *Brill,* 21 Idaho 269 [121 P. 79]; *Triplett* v. *Commonwealth,* 122 Ky. 35 [91 S.W. 281]; *Glenn* v. *State,* 49 Tex.Crim.Rep. 349 [92 S.W. 806, 13 Ann.Cas. 774, 775], and cases cited in note; *Temple* v. *State,* 86 Tex.Crim.Rep. 219 [215 S.W. 965]; note, 135 Am.St.Rep., p. 485.) While there appears to be a conflict of authority on the question whether felonious intent is present when the defendant seeks the recaption of money lost by him at an illegal game (note, 135 Am.St. Rep., pp. 485-489), the weight of authority supports the conclusion that the intent to steal is lacking in such a case, for the law recognizes no title or right to possession in the winner. It is the law in this state that certain games of chance, such as lotteries, are illegal; that the winner gains no title to the property at stake nor any right to possession thereof; and that the participants have no standing in a court of law or equity. (*Gridley* v. *Dorn,* 57 Cal. 78 [40 Am.Rep. 110];

*Bank of Orland* v. *Harlan,* 188 Cal. 413, 421 [206 P. 75];
16 Cal.Jur., p. 716.)   In jurisdictions where such is the state
of the law the weight of authority appears to favor the view
that the recaption by force or fear of money lost at illegal
games is not robbery, although the act may be punishable
as an unlawful assault or trespass.   (*People* v. *Hughes,
supra; Thompson* v. *Commonwealth,* 13 Ky.LawRep. 916
[18 S.W. 1022]; *Sikes* v. *Commonwealth,* 17 Ky.LawRep.
1353 [34 S.W. 902]; *Gant* v. *State,* 115 Ga. 205 [41 S.E.
698]; *State* v. *Price,* 38 Idaho, 149 [219 P. 1049, 35 A.L.R.
1458], and note at p. 1461; notes, 57 L.R.A. 443; 13 Ann.Cas.
775; 21 Ann.Cas. 1139; 40 L.R.A. (N.S.) 805, 806.)   The
courts recognize that in such a case, whatever other element
of crime may be present, there cannot exist an intent to steal
or take feloniously the property of another, which is an es-
sential element of the crime of robbery.   In *People* v. *Hughes,
supra,* it was said: 'In all criminal cases the question of in-
tent is an important one.   If this element is lacking, the
general rule is that no offense has been committed.   This
rule is not only humane, but a contrary one would be opposed
to all the principles which underlie human conduct as re-
spects the bearing of individuals towards each other, and
also as regards their position towards the state.   And so the
law is that, when evil intent is lacking, the act or omission,
which otherwise would constitute an offense, is robbed of its
criminality.   The rule governing this class of cases seems
to be well settled and thoroughly defined.   In a note in 70
Am.Dec. 188 (*State* v. *McCune*), where a number of authori-
ties are collected, this proposition is laid down: "When the
prisoner takes the property under a *bona fide* impression
that the property belongs to him, he commits no robbery,
for there is no *animus furandi.*" . . .   The defendant in
all cases is entitled to have the law governing his case given
to the jury for their guidance, and in this case the question
of honest belief and *bona fide* intention should have been
submitted to and passed upon by the jury under proper in-
structions.' . . .

   "It has also been held that in resisting the charge of rob-
bery by a showing that the intention was the recaption of
money lost at an illegal game, it is not incumbent upon the
defendant to prove that the money reclaimed was the iden-
tical money won from him.   (*Sikes* v. *Commonwealth, su-
pra; Gant* v. *State, supra.*)   However, the accused must in-

tend in good faith to retake his own property. The question of intent is one for the jury which may find, if the facts justify it, that the defendant's expressed intent was a mere pretext resorted to as a cover for an intent to steal. (*Crawford* v. *State*, 90 Ga. 701 [17 S.E. 628, 629, 35 Am.St.Rep. 242].) . . .

"The court did instruct the jury on the necessity of the union of act and felonious intent and in addition that 'one cannot be guilty of robbery where the property taken belonged to him, even though the taking is accomplished by force or fear.' But the failure to instruct further on the theory of the defense that it was the defendant's *bona fide* belief that the money was his own constituted prejudicial error on the record here presented."

It must be admitted that there is strong similarity between the facts of the Rosen case and those of the instant case, but we do not believe that we would be justified in holding that upon the record in the instant case, the jury could not have found appellant guilty of robbery. The jury is the exclusive judge of the weight of the testimony, and in view of the fact that the record shows that appellant ordered Bailey to take the money from his pocket and place it on the bar, and persisted in ordering him to do so after Jungbluth had knocked Bailey down, and in view of the further fact that the jury may well have drawn the inference from the testimony that appellant had lost not more than $35, in the stud poker game, and that Bailey had not been cheating, the jury may have concluded, quite properly, that appellant did not in good faith intend to take only the money that he had lost, but that appellant had made the demand that all the money he placed on the bar and the accusation that Bailey had been cheating as a mere pretext to cover up an intent to steal. It must be admitted that the facts in the instant case are most unusual, and one may well be surprised that appellant was found guilty of robbery, but under the familiar rule that a judgment of conviction will not be reversed if the verdict finds some support in the record, we cannot say that the finding of the jury that appellant was guilty of robbery finds no support in the record.

What we have just said, however, does not mean that we are satisfied that appellant's conviction of robbery in the first degree is sustained by the record. Robbery in the first degree, as defined by section 211a of the Penal Code, is "all

robbery which is perpetrated by torture or by a person being armed with a deadly weapon." We have searched the record in vain for any evidence that at or prior to the time the robbery was completed, appellant was armed with a deadly weapon. No witness testified that any weapon was seen on the person or in the possession of appellant until sometime after Bailey had placed his money on the bar. Certainly appellant did not use any gun or other weapon in the commission of the robbery. The record shows that after the money had been placed on the bar by Bailey, and a new argument between appellant and Bailey had begun, appellant began to choke Bailey, and while he was doing so, someone commenced to knock on the door between the barroom and the kitchen, which had been locked after appellant, Bailey, Hendrix and Jungbluth had re-entered the barroom, and demanded admission; that Hendrix then pulled appellant away from Bailey, and appellant went from where Bailey was in the space in front of the bar, to the west end of the bar through the lift, and back behind the bar to the door leading to the kitchen, and ordered whoever was on the other side to go away; that someone then started to kick vigorously on the door, and that appellant then shot downward through the door. Bailey testified:

"A. I didn't see the gun until he had it in his hand—where he got it I couldn't say, or anything else. Q. And when you looked over there, he had it in his hand, and was that before or after the shooting? A. That was just as he started shooting."

Respondent argues that "it is reasonable to say that appellant had the gun in his possession even when he commanded the victim to put the money on the bar." We do not believe that such an inference can be drawn from the record, and before a defendant is convicted of first degree robbery, there should be evidence that he was armed with a deadly weapon, and not merely that he might have been so armed.

We conclude, therefore, that the evidence was insufficient to sustain a verdict of robbery in the first degree, even though we have concluded that the evidence would sustain a verdict of robbery in the second degree.

■ Appellant contends that the evidence was insufficient as a matter of law to sustain his conviction of assault with

a deadly weapon. There is no merit in this contention. The jury may well have concluded from the evidence that appellant knew who was on the other side of the door, that he had reason to believe that they wanted to have the door opened so that they could find out what was going on in the barroom, or leave the premises in the same way they had come in, and that appellant had no reason to believe that any harm was intended to him. The persons who were in the kitchen had gone into the kitchen through the barroom, and it was reasonable to suppose that they would leave the premises by way of the barroom, and it was further reasonable to suppose that they would knock on the door leading from the kitchen into the barroom when they found it locked, as it was not locked when they entered earlier in the evening. Appellant was the proprietor of the barroom, and was of course familiar with the premises, and knew that the persons who had gone into the kitchen, with his knowledge and consent, had a right to come back into the barroom. The jury is, of course, the judge of the weight and effect of the testimony, and there was sufficient evidence to sustain the verdict of guilty of assault with a deadly weapon.

■ The court refused to instruct the jury, as requested by appellant, that ''a defendant charged with the offense of assault with a deadly weapon may be convicted of simple assault,'' nor did the court give a similar or modified instruction to that effect; and the court also failed to submit to the jury a form of verdict whereby it might have found appellant guilty of simple assault. Appellant contends that this constituted reversible error.

Section 1159 of the Penal Code provides as follows:

''The jury may find the defendant guilty of any offense, the commission of which is necessarily included in that with which he is charged, or of an attempt to commit the offense.''

The law is well settled in California that a court may properly refuse to instruct upon simple assault where the evidence is such as to make it clear that if the defendant is guilty at all, he is guilty of the higher offense. See *People v. Galloway,* 104 Cal.App. 422 [286 P. 476] ; *People v. Rogers,* 163 Cal. 476 [126 P. 143] ; *People v. Thomas,* 100 Cal.App. 82 [279 P. 826] ; *People v. Albory,* 97 Cal. 537 [275 P. 1017] ; *People v. Lopez,* 135 Cal. 23 [66 P. 965] ; *People v. Madden,* 76 Cal. 521 [18 P. 402].

In the instant case the appellant testified that he intended to shoot through the floor to frighten the person on the other side of the door who was threatening to break it down after appellant had ordered him to get away from the door. There was no denial that appellant did shoot through the door and that the shots fired by him struck Dutcher. If the jury believed that under all the circumstances shown by the record he was justified in shooting through the door as he did, then he was not guilty of any offense, but there was no reasonable basis for finding him guilty of simple assault, and hence the trial court was justified in refusing to so instruct the jury and in refusing to submit such a form of verdict to the jury. The issue of self-defense was also presented by appellant, and the court fully and fairly instructed the jury upon that issue.

Appellant attacks numerous instructions given by the trial court. In the instant case there were two counts, and the matter of instructing the jury in a manner that would not be somewhat confusing was far from easy. Taking the instructions as a whole, we believe that the jury was fully and fairly instructed, and that appellant was not prejudiced by the giving of the instructions complained of. We believe also that the instructions given by the court covered the matters included in the instructions offered by appellant and refused by the court.

We believe that the court erred in refusing appellant permission to ascertain the occupation of Bailey, who was the alleged victim of the robbery and the chief witness against appellant. On direct examination he testified that he resided in Jefferson, Oregon, and his occupation was that of a patrolman with the Southern Pacific Company. Upon cross-examination he admitted that he had been employed by the Southern Pacific Company for only about seven weeks. He was then asked by counsel for appellant as to how many times he had been in Woodland prior to the time of the alleged robbery, and on what occasions. The district attorney objected to any answer by the witness which would specify the occasions. Counsel for appellant then stated that he desired to ascertain the occupation of the witness both before and after April 2, 1942. The court sustained the objection of the district attorney. Counsel for appellant then asked the following questions, objections to which were sustained by the court:

"Have you not for a period of two years earned the greater portion of your livelihood playing poker?

"During the time that you were in Woodland prior to April 2nd, did you not earn your livelihood dealing and playing poker?

"On every other visit that you made prior thereto to the City of Woodland, did you not make your livelihood playing poker?

"Is it not a fact that since 1925 up to the present time, outside of these seven weeks you have been employed, ninety-five per cent of the time you have earned your livelihood playing poker?

" . . . weren't you spending the greater portion of your time gambling?"

It is the contention of appellant that so to limit the cross-examination of this particular witness so as to prevent disclosure of facts which would identify the witness with his environment was prejudicial to the cause of this appellant and constitutes an additional reason for the reversal of the judgment herein.

In the case of *Alford* v. *United States,* 282 U.S. 687-694 [51 S.Ct. 218, 75 L.Ed. 624], the Supreme Court of the United States, in reversing the judgment of conviction said:

"Cross-examination of a witness is a matter of right. . . . Its purposes, among others, are that the witness may be identified with his community so that independent testimony may be sought and offered of his reputation for veracity in his own neighborhood . . . ; that the jury may interpret his testimony in the light reflected upon it by knowledge of his environment; (citing cases) . . . and that facts may be brought out tending to discredit the witness by showing that his testimony in chief was untrue or biased. (citing cases) . . . Counsel often cannot know in advance what pertinent facts may be elicited on cross-examination. For that reason it is necessarily exploratory; . . . Prejudice ensues from a denial of the opportunity to place the witness in his proper setting and put the weight of his testimony and his credibility to a test, without which the jury cannot fairly appraise them. (citing cases) To say that prejudice can be established only by showing that the cross-examination, if pursued, would necessarily have brought out facts tending to discredit the testimony in chief, is to deny a substantial right and withdraw one of the safe-guards essential to a fair trial. (citing

cases) . . . The question 'Where do you live?' was not only an appropriate preliminary to the cross-examination of the witness, but on its face, . . . was an essential step in identifying the witness with his environment, to which cross-examination may always be directed. (citing cases) . . . no obligation is imposed on the court, such as that suggested below, to protect a witness from being discredited on cross-examination, short of an attempted invasion of his constitutional protection from self-incrimination, properly invoked. . . . The trial court cut off in limine all inquiry on a subject with respect to which the defense was entitled to a reasonable cross-examination. This was an abuse of discretion and prejudicial error.''

In the instant case the district attorney had developed, upon direct examination, that Bailey's occupation was that of a patrolman for the Southern Pacific Company, and we believe that the trial court should not have sustained the objection to the questions as to Bailey's occupation, though such error, in our opinion, is not sufficient to justify a reversal of the judgment, in view of evidence that Bailey had been playing cards at different times prior to the night in question.

■ Appellant's final contention is that it was prejudicial error for the trial court to place the jury in charge of Fred Ewert, the deputy sheriff who had been a witness for the prosecution. This contention lacks merit because appellant made no objection at the time. As was said in *People* v. *Stennett*, 51 Cal.App. 370, 380 [197 P. 372] :

"The point was not made in the court below and cannot for the first time be raised on appeal. Indeed, by his failure to object to the order at the time it was made, the defendant waived any objection which might have been interposed to the order placing the jury in charge of the sheriff's deputy.''

For the reasons hereinbefore set forth we believe that the judgment and order should be affirmed as to count one, and that as to count two the judgment must be reversed and a new trial granted.

It is so ordered.

Adams, P. J., and Thompson, J., concurred.

A petition for a rehearing was denied February 27, 1943, and appellant's petition for a hearing by the Supreme Court was denied March 11, 1943.