[Crim. No. 5421. Second Dist., Div. Two. Apr. 2, 1956.]

THE PEOPLE, Appellant, v. JOSEPH A. NOVELLI, Respondent.

S. Ernest Roll, District Attorney, Edward L. McLarty and Fred N. Whichello, Deputy District Attorneys, for Appellant.

Maxwell E. Greenberg as Amicus Curiae on behalf of Appellant.

Clifford E. Enger and Le Vone A. Yardum for Respondent.

MOORE, P. J.—Respondent was accused by information of grand theft (Pen. Code, §§ 487-495) in that he feloniously took two certain 1,000 barrel steel oil tanks and other oil well equipment of the value of more than $2,000, the property of Lyndon R. Foster.

He was convicted by a jury but the court granted his motion for a new trial on the grounds that the verdict was against the weight of the evidence and certain instructions were contrary to the law.

The judge observed that the title to the property remained in respondent at all times; that therefore by his act of repossessing it, grand theft could not have been committed. "These matters could have and should have been developed a little sooner through the civil courts. I do not feel that a crime in the sense of grand theft as alleged was committed according to all the evidence submitted here." We are now called upon to determine that the court's order granting a new trial was error. We shall reject such plea on two grounds, namely, (1) the record discloses proof of such quality as reasonably warranted the trial court in concluding that respondent removed the tanks in question from the land of Mr. Foster in the sincere belief that he was entitled to their possession; (2) in the exercise of a sound discretion the court found the conflicts in the evidence and in the inferences fairly deducible

therefrom were such as to induce the conclusion that the jury had not clearly comprehended the evidence favorable to Novelli.

### CERTAIN FACTS INDICATE RESPONDENT INNOCENT

The transcript and appellant's briefs are so voluminous that a fair analysis and an elucidation of the pertinent facts are rendered difficult. It is our purpose to endeavor to inject into the picture only the salient events that transpired and to demonstrate that only by a misinterpretation thereof could respondent have been found guilty.

In June 1948 Lyndon Foster purchased a parcel of land, 1/10 acre in Placerita Canyon in Los Angeles County. In August 1949 Foster leased the land to one Morse for oil development. That lease conveyed to Morse five-sixth interest in the oil and gas that underlay the parcel, leaving Foster a landowner's royalty interest of one-sixth of such oil and gas, or one-sixth of the proceeds derived from the sale of such products.

On September 22, 1949, an "operating agreement" was executed by Foster in favor of "Ethyl-Jean Corporation" for the development of his parcel, but since that corporation did not exist, Foster still held his title unimpaired. On the same day of Foster's abortive attempt at procuring the operating agreement, Mr. Morse undertook the development of Foster's parcel by procuring the necessary equipment for drilling a well. Thereupon, he encountered Novelli who operated Ben Hur Refining Corporation, herein referred to as Ben Hur although it subsequently changed its name to Eureka Oil and Refining Corporation. It entered into a contract with Morse to furnish casing for the "Foster No. 1 Well" for a 15 per cent gross royalty. Also, on the same day Ben Hur executed a "conditional sales contract"* with Morse, in evidence as Exhibit 6A, herein referred to as "6A." It was an agreement to sell Morse a number of items such as tubing, float collar, pump valves, etc., and also two oil tanks, all to cost $10,670.71. The two oil tanks listed on 6A are the identical tanks referred to in the accusation of Novelli. They were valued by Ben Hur at $2,193.35 and $1,912.28. By the terms of 6A, 85 per cent of the proceeds of the production of Foster Number 1 was to be paid Ben Hur until the total of $10,670.71

---

*Morse signed as agent for Foster, but the latter denied Morse's agency and never signed the contract 6A.

should be paid, but it was subordinated to the payment of $4,276.51 due Ben Hur on the oil casing from Foster. The total equipment was delivered at Foster Number 1 well and in due season the well was placed on production.

The contract 6A declared time to be the essence thereof, and that upon buyers' failure to comply with the conditions or terms of the contract, the "Seller at his option, and without notice to the Buyer may elect to declare all the rights of the Buyer hereunder terminated and take possession of the said property, wheresoever found, and hold the same discharged from any further liabilities under this contract, and the Buyer hereby waives all claims for damages growing out of such taking."

The foregoing discloses that Novelli repossessed the steel tanks in accordance with his conditional sales contract made prior to their installation on the Foster well. The title to each item remained at all times in respondent's Ben Hur. His act in having his employee repossess them was authorized by the terms of his contract. Such taking was not felonious. Therefore, it was not grand theft. (*In re Bayles,* 47 Cal.App. 517, 520 [190 P. 1034].) Novelli's repossession of the tanks was merely a legal, good faith attempt to liquidate the unpaid balance due his corporation. He made no effort to do so before he had negotiated with the attorney for Kia-Ora, successor of Northridge, which accepted the $2,400 credit for the tanks. There is no evidence that he did anything more than what he thought his contract authorized him to do.

In August 1949 Northridge Oil Corporation was organized. It executed a new "operating agreement" with Foster but the record contains no assignments of interest to Northridge. Ben Hur treated Northridge as the partner or general agent of Foster and they modified the terms of 6A with respect to the method of payment of the balance due thereon. In 1951 Ben Hur caused its comptroller, Mr. Adkins, to audit the accounts of Foster No. 1 well. He discovered that funds which should have been credited to its open account had been erroneously credited to the conditional sales contract 6A. By reason of the result of the new entries then made, the balance due on 6A was $10,670.71. In other words, nothing had been paid on the drilling equipment including the two steel tanks and the well was not then on production.

The Kia-Ora Oil Company then succeeded to the interests of Northridge subject to the amount due on 6A. Having failed to restore the well to production, Kia-Ora agreed with

Novelli that Ben Hur might repossess the two steel tanks and credit 6A in the sum of $2,400. Acting upon such agreement, Ben Hur dismantled the tanks, had them and certain other items moved in the daytime by Moberly Jones Tank Construction Company to a different location. Two years later, June 1954, Foster filed a complaint against Novelli, charging him with grand theft.

The hold on the tanks claimed by Foster is very tenuous. In his letter to Novelli, Foster claimed that his interest in the tanks and drilling equipment arose out of his contract with "Helen-Jean." But such contract was not received in evidence; neither was its loss or destruction proved. (Code Civ. Proc., §§ 1855, 1937.)

In fact, no basis for such claim as Foster makes can be found prior to his agreement with Northridge, January 9, 1950, or three months after the conditional sale by Ben Hur whereby the allegedly stolen tanks had been delivered to Foster Number 1 well on a contract between Ben Hur and Morse, the lessee of Foster. The latter denied that he had authorized Morse to make a contract. The delivery of the tanks to Foster's well did not serve to vest Foster with title to them. They did not become a part of the realty or of the lease. By the contract of sale, (6A), the parties intended that the items should remain personalty. They became appurtenant to the mineral rights in the land. (*Wagner Supply* v. *Bateman*, 118 Tex. 498 [18 S.W.2d 1052]; *Son* v. *Adamson*, 188 Cal. 99, 102 [204 P. 392].)

Since, according to the record, Morse acted for himself in executing 6A, Foster was not a party to the conditional sales contract. Morse only was bound by its terms. While he claimed to be Foster's agent at the time, Foster denied the agency. Therefore, if Foster is correct, he is not bound by the contract unless he has ratified it. But Morse is bound by its terms. (*Ferroni* v. *Pacific Finance Corp.*, 21 Cal.2d 773, 777 [135 P.2d 569].) In that event, the "operating agreements" of Foster are all junior to the conditional sales contract which did not convey title to Foster or to any other but reserved it in Ben Hur. If Foster was not obligated by reason of the conditional sales contract (6A), he could have no claim to the equipment described therein. His assertion of such claim is of no more effect than the claim of an utter stranger.

For still another reason Foster's asserted claim of title to the tanks is without right. While Northridge was "oper-

ating'' Foster Number 1 well as Foster's managing partner, Northridge effected an agreement with Ben Hur to the effect that the ''total balance due on October 17, 1951, will be $10,670.71 . . . Upon the payment in full'' of that sum Ben Hur agrees to give to Northridge a ''bill of sale and full clear title to all the equipment and machinery covered by'' the conditional sales contract. Inasmuch as Foster was a party to neither the conditional sales agreement 6A nor the contract of October 1951 modifying the method of paying the balance due, his intention in respect to the matter is not to be considered.

Appellant contends that respondent committed theft by his false representations that Foster Number 1 well was indebted to Ben Hur in the sum of $10,670.71 when in fact the true balance due was $1,425.51; that the documents in evidence and the books of account prove that it was the ''intent of Novelli to take from Mr. Foster his 39% interest in the well or any part thereof that he could fraudulently get.'' Counsel follows the foregoing with the statement that Foster was defrauded of his ownership of 39 per cent of said equipment in that the attorney of Kia-Ora Oil Corporation relied upon Novelli's false representations in assuming the obligation of $10,670.71. Appellant contends that the transfer of the credits that had been entered upon Foster Number 1 well account to the operating expense account was fraudulently caused by respondent. But the explanation of Ben Hur's accountant that the credits had been made erroneously to contract 6A was a rational explanation, as well as the accountant's testimony that he, on his own account in the performance of his duty, had caused the transfer to be made. Such testimony appears to be a thoughtful and true account of the transactions prior to the transfer of such credits. But if the ''true balance'' due Ben Hur at the time of reclaiming the tanks had been only $1,425.51, that balance unpaid would have justified the repossession of the tanks. No offer to pay Ben Hur that sum has been disclosed and the account had continued for two years after the acquisition of the equipment and much oil had been sold from the well.

Appellant contends that the evidence supports a verdict of theft on the theory of trick and device; that the ''title to the tank passed from Novelli . . . on February 29, 1952, when the purchase price had been overpaid.'' Such contention is disposed of by the above review of the facts and the

correction of Ben Hur's account to show no credits at all on the account of 6A.

Also, appellant insists that respondent was guilty of grand theft under the theory of embezzlement; that he had possession of the equipment and "fraudulently removed credits from the conditional sales contract account . . . thereafter releasing custody and control of the equipment to Kia-Ora Oil Corporation"; that the release of the equipment by Kia-Ora "placed the lawful possession of the tanks and equipment in defendant." The fact appears to be that Kia-Ora took a definite credit of $2,400 for the tanks.

In view of the fact that Foster was not a party to any one of the three agreements with respect to the purchase of and the payment for the equipment placed on Foster Number 1 well by Novelli and his corporation, it is definitely established that Foster never became owner of and entitled to such equipment.

Aside from the foregoing which demonstrates (1) that Foster was never owner of the equipment, and (2) that the title thereto was always vested in Novelli or his corporation, the order granting a new trial cannot be disturbed for two additional reasons:

(1) The equipment was repossessed by Novelli openly, in good faith and with the sincere belief that it belonged to the Eureka Oil Corporation. (*In re Bayles*, 47 Cal.App. 517, 520 [190 P. 1034].) Hence, he could not have taken it with felonious intent. (*People* v. *Sheasbey*, 82 Cal.App. 459, 463 [255 P. 836]; *People* v. *Rosen*, 11 Cal.2d 147, 149 [78 P.2d 727, 116 A.L.R. 991]; *People* v. *Photo*, 45 Cal.App.2d 345, 353 [114 P.2d 71]; *People* v. *Henry*, 132 Cal.App. 557, 560 [23 P.2d 77]; *Burke* v. *Watts*, 188 Cal. 118, 125 [204 P. 578].)

(2) In the matter of granting a new trial on the basis of the insufficiency of the evidence, the trial court is vested with a broad discretion with respect to an issue upon which the reviewing court cannot pass unless it be made clearly to appear that such discretion was abused. The appellate court cannot appraise the weight of the evidence. That function is within the exclusive province of the trial court. "So also, the *effect* of error, under the evidence, is primarily for the trial court and its determination on that question is usually conclusive." (*People* v. *Sarazzawski*, 27 Cal.2d 7, 15 [161 P.2d 934]; *People* v. *Busby*, 40 Cal.App.2d 193, 204 [104 P.2d 531]; *People* v. *Espinola*, 38 Cal.App.2d

482, 485 [101 P.2d 545].) ■ When there is a substantial conflict in the evidence, the granting of a new trial is largely within the discretion of the trial judge. (*People* v. *Simpson*, 134 Cal.App. 646, 649 [25 P.2d 1008] ; *People* v. *Driggs*, 111 Cal.App. 42, 45 [295 P. 51].) ■ If there is any appreciable conflict in the evidence, the order granting a new trial is not open to review. (*People* v. *Wilson*, 100 Cal.App. 397, 402 [280 P. 137] ; *People* v. *Prudencio*, 93 Cal.App. 241, 247 [269 P. 698] ; *People* v. *Baker*, 39 Cal. 686, 687.) ■ The losing litigant, on his motion for a new trial, is entitled to a decision by the trial judge on the sufficiency of the evidence. (*People* v. *Navarro*, 74 Cal.App.2d 544, 554 [169 P.2d 265].)

Counsel for appellant conceded in oral argument that there is conflict in the evidence of sufficient substantiality to warrant the granting of a new trial, if the trial judge has the power to reweigh the evidence and grant the motion in the face of a conflict. The argument then made by appellant's counsel to the effect that the court has no power to set aside a verdict and reverse the judgment is not only novel but is contrary to the cited decisions by which we are bound. The right and duty to make final decision on factual questions has always reposed in the heart of one who is learned in the law and who has heard all the evidence. ■ ''While it is the exclusive province of the jury to find the facts, it is nevertheless one of the most important requirements of the trial judge to see to it that this function of the jury is intelligently and justly exercised.'' (*People* v. *Prudencio, supra,* p. 247.)

In view of the foregoing, a discussion of the other points will not be necessary. Order affirmed.

Ashburn, J., concurred.

Mr. Justice Fox did not participate in this decision.

A petition for a rehearing was denied April 16, 1956, Fox, J., did not participate therein. Appellant's petition for a hearing by the Supreme Court was denied May 2, 1956.