[No. S072486. Nov. 15, 1999.]

THE PEOPLE, Plaintiff and Respondent, v.
HALALIKU KALONI TUFUNGA, Defendant and Appellant.

## COUNSEL

Cliff Gardner, under appointment by the Supreme Court; and Stephen M. Gallenson, under appointment by the Court of Appeal, for Defendant and Appellant.

Eric S. Multhaup for California Attorneys for Criminal Justice as Amicus Curiae on behalf of Defendant and Appellant.

Daniel E. Lungren and Bill Lockyer, Attorneys General, George Williamson and David P. Druliner, Chief Assistant Attorneys General, Ronald A. Bass, Assistant Attorney General, Stan M. Helfman, Christopher W. Grove and Jeffrey M. Laurence, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**BAXTER, J.**—The claim-of-right defense provides that a defendant's good faith belief, even if mistakenly held, that he has a right or claim to property he takes from another negates the felonious intent necessary for conviction of theft or robbery. At common law, a claim of right was recognized as a defense to larceny because it was deemed to negate the *animus furandi*, or intent to steal, of that offense. (See 4 Blackstone, Commentaries 230 (Blackstone).) Since robbery was viewed as an aggravated form of larceny, it was likewise subject to the same claim-of-right defense. (*Id.* at pp. 241-243.)

In *People v. Butler* (1967) 65 Cal.2d 569 [55 Cal.Rptr. 511, 421 P.2d 703] (*Butler*), we reaffirmed that a claim-of-right defense can negate the requisite felonious intent of robbery as codified in Penal Code section 211[1] and extended the availability of the defense to forcible takings perpetrated to satisfy, settle or otherwise collect on a debt, liquidated or unliquidated.

In light of the strong public policy considerations disfavoring self-help through force or violence, including the forcible recapture of property, we granted review in this case to consider whether claim of right should continue to be recognized as a defense to robbery in California. Since *Butler* was decided over 30 years ago, courts around the nation have severely restricted, and in some cases eliminated altogether, the availability of the defense in prosecutions for robbery. As will be explained, however, the "felonious taking" required for robbery under section 211, as well as that for theft under section 484, is a taking accomplished with felonious intent, that

---

[1] All further statutory references are to this code unless otherwise indicated.

is, the intent to steal, a state of mind that California courts for over 150 years have recognized as inconsistent with a good faith belief that the specific property taken is one's own. When our Legislature incorporated this mental state element into the definition of robbery upon codifying the offense in 1872, it effectively recognized claim of right as a defense to that crime. This court is therefore not free to expand the statutorily defined mens rea of robbery by eliminating claim of right as a defense altogether on policy grounds. (§ 6; *In re Brown* (1973) 9 Cal.3d 612, 624 [108 Cal.Rptr. 465, 510 P.2d 1017].)

Since the Legislature incorporated the claim-of-right doctrine into the statutory definition of robbery over a century ago, the question whether it continues to reflect sound public policy as we enter the 21st century must be addressed to that body and not to this court. (Cal. Const., art. III, § 3 [guaranteeing the separation of powers of the legislative and judicial branches].) Nonetheless, as will further be explained, we find nothing in the language of section 211 to suggest the Legislature intended to incorporate into the robbery statute *Butler*'s broad extension of the claim-of-right defense to forcible takings perpetrated to satisfy, settle or otherwise collect on a debt, liquidated or unliquidated. To the extent *Butler*'s expansion of the claim-of-right defense in that regard is unsupported by the language of the robbery statute and contrary to sound public policy, it is overruled.

## I. FACTUAL AND PROCEDURAL BACKGROUND

An amended four-count information charged defendant Halaliku Kaloni Tufunga with assault with a deadly weapon or force likely to produce great bodily injury (§ 245, subd. (a)(1)), residential robbery (§§ 211-212.5, subd. (a)), spousal abuse (the victim being the mother of his child) (§ 273.5), and making terrorist threats (§ 422) based on an episode of violence against his former wife, Shelly Tufunga. A jury found him guilty as charged on all but the first count (assault with a deadly weapon or force likely to produce great bodily injury), on which it convicted him of the lesser offense of battery (§ 242). An allegation that defendant had used a deadly or dangerous weapon (scissors) (§ 12022, subd. (b)) was found true in connection with the conviction of making terrorist threats, but not true in connection with the conviction of spousal abuse. Defendant was sentenced to state prison for the middle term of four years for robbery plus a subordinate term of one year for spousal abuse, with the enhancement finding stricken and all remaining terms to run concurrent with the aggregate five-year prison sentence.

Shelly Tufunga (Shelly) testified that around 5:00 p.m. on January 16, 1996, defendant, who is her former husband, his first wife Pelenaise (or

Pele), and his daughter Lokelomi (or Loni) from that marriage came to Shelly's residence, pushed their way inside, and started yelling obscenities at her. Pele and Loni accused her of having made derogatory comments about Pele's younger daughter Helen's sexual promiscuity.

Defendant pushed Shelly to the floor and kicked her in the hip and thigh. He then threw her onto the couch and ordered the other women out of the residence, saying he would "take care of" her. After they left, defendant straddled Shelly on the couch, slapped and hit her, grabbed a pair of nine- or ten-inch scissors and, making overhead stabbing motions toward her face, forehead and neck, said he was going to "mess up her face," shove the scissors up her "big fat ass" and "make it so that nobody would be able to look at" her. Afraid for her life, Shelly begged him to stop. She dodged stabs at her eyes but suffered scratches to her forehead, neck and arms before defendant finally stopped, put the scissors down, and got off of her. He continued to yell, at one point breaking a lamp in the home.

Shelly's mother Josephine arrived at the house while defendant was still there. Initially unaware of the fracas, she handed Shelly $200 in cash for Shelly to use to purchase medicine and vitamins for her. Shelly testified she kept track of her mother's finances and routinely purchased vitamins and medicines the mother needed for her illness. Shelly put the money down on the coffee table, excused herself, and retired to the bathroom. When she reemerged, Josephine noticed her face was bruised, said, "My God, what happened?," and confronted defendant. Reminding him that she had said she was not going to stand for any more of this, Josephine picked up the phone to call the police. Defendant screamed at her and grabbed her by the arm, knocking the phone out of her hand. When Shelly intervened, defendant grabbed Shelly by the neck, shaking and choking her while screaming at them both.

Defendant then ran out the front door. Josephine yelled, "Shelly, he took the money," and tried to stop him. Shelly ran outside, wrote down the license number of the car defendant was driving, and called 911. That evening she filed a police report detailing the incident. After the incident but prior to his arrest, defendant returned to Shelly's apartment on several occasions; she did not call the police at those times out of fear for her safety.

Jurors saw photos of Shelly's injuries taken that same day. Responding police officers testified she was crying and appeared bruised and scratched. She reported that defendant had held the scissors against the bridge of her nose. She thought he had taken the money off the couch.

Shelly testified further that in April 1995 she had gotten a restraining order against defendant after being forced to move into a battered women's

shelter with her daughter for a month because he was physically hitting and abusing her. At that time defendant had been coming over to her apartment, kicking the door in, hitting and pushing her, and wrecking the place.

Josephine also testified at trial, corroborating most of Shelly's account. She recalled that when defendant grabbed the phone he had unplugged it and threatened to kill her. When he choked Shelly, Josephine hit him on the head with the phone, without effect. Josephine thought Shelly had the $200 in her hand when she returned from the bathroom and dropped it on the table as defendant started choking her. Defendant hit Shelly a couple of times, grabbed the money off the table and left, pushing Josephine when she tried to stop him. Josephine called the police after defendant ran from the apartment.

Defendant testified in his own behalf and, after acknowledging prior felony convictions for forgery and grand theft, gave a different account of the incident leading to his arrest. He, and occasionally his daughters as well, had been living in Shelly's apartment around that time (Shelly testified defendant occasionally stayed at her home against her will, explaining defendant was very big and that she could not stop him from coming over). On the date in question he was paid $200 in cash by his employer/relative Hermasi Latu, who testified for the defense to corroborate that fact. Defendant claimed he knew Shelly had a bill due on the 19th of the month and had promised to bring her money to help with it. He brought the $200 over to Shelly's apartment that afternoon and put it down on the coffee table, stating it was to help pay for the bill. He claimed he and Shelly were watching television without incident when his former wife Pele and their daughter Loni arrived and the argument ensued. Defendant testified he told Pele and Loni to leave, which they did, after which he and Shelly themselves began arguing about the accusations his former wife was making against her. Defendant told Shelly he believed her mother Josephine was causing trouble between them and with his children by Pele. Defendant admitted the argument grew loud and that he broke a vase in the apartment, but he claimed he did not strike Shelly.

Josephine soon arrived at the apartment. When she asked Shelly why she was upset, Shelly told her defendant brought Pele and Loni to the apartment and they had tried to hit her. Defendant tried to explain, but Josephine said, "I'm sick and tired because you're hitting my daughter all the time," and went to the phone to call 911. Defendant and Josephine knew there was a warrant outstanding for defendant's arrest and he believed she was calling the police to have him arrested. He tried to talk Josephine out of it and told her to stay out of the argument between Shelly and him. At that point Shelly

reached down, picked up the $200 from the coffee table and put it in her bra. Defendant believed the two were out to take the money, as this had happened before, and that Shelly would give it to her mother. Defendant demanded the money back and, when Shelly refused, wrestled with her, reached into her bra and took it back. As he walked out the door Josephine hit him with the phone. Shelly followed him outside and got the license plate number of the car he was driving as he drove off. Defendant testified he did not threaten, strike or push Shelly that day and had not broken into her apartment or stayed against her will. Defendant testified that three days later he and Shelly made up, and that he at that time gave her $160 to help pay her bills.

Pele and Loni testified for the defense, corroborating the story that Shelly had made accusations about Pele's daughter Helen and claiming they had come to Shelly's residence on the date in question and found defendant already there. Shelly appeared upset and looked as though she had been crying, but neither visitor saw defendant assault her. Twelve-year-old Helen also testified, confirming she had been living in Shelly's apartment with defendant and testifying further that, while defendant and Shelly would argue on occasion, he did not hit her.

Called in rebuttal, Shelly testified defendant never brought her money and in fact knew her paydays, regularly beat her and took her money, and continually threatened her and her family members.

## II. DISCUSSION

At trial, the defense requested instruction on a claim-of-right defense to the charge of robbery. The trial court concluded the facts would not support the defense and refused to instruct on it. On appeal, defendant urged that even if he had used force to take back his $200, that fact is immaterial to the existence of his bona fide belief in his right to take back the money he conditionally gave to Shelly, once he concluded in good faith that she was not going to use it to pay bills and would instead turn it over to her mother. The People responded that defendant furnished no substantial evidence of a bona fide belief in his right to reclaim the money. Although the source of the money present in the apartment during the incident was therefore disputed at trial—Shelly claiming her mother brought over the money, which defendant then stole from them; defendant claiming he had brought over the $200 to give to Shelly to pay bills, then took it back upon concluding she would not use it for the purpose for which it was offered—it was not disputed that the same $200 in currency was at the heart of the controversy. In other words, if defendant's version of the incident was believed, there was no further

evidence or claim by the People that Shelly had commingled the specific currency he gave her with her own funds before he grabbed it back and fled from the apartment.

We recently summarized the nature and scope of a claim-of-right defense to robbery after this court's decision in *Butler, supra,* 65 Cal.2d 569, as follows: "In [*Butler*], the defendant was accused of felony murder based on the underlying crime of robbery. At trial, the defendant testified he had been employed by the victim, who had not paid him for some work. The defendant, armed with a gun, went to the victim's home one evening to collect payment. Although the victim had at one point agreed to pay the defendant, he subsequently changed his mind and approached the defendant with a pistol. During the ensuing scuffle, the defendant shot and killed the victim, and also shot another person present in the victim's home. After quickly searching the home for money and finding none, the defendant grabbed a wallet and ran from the house. In recounting the events, the defendant claimed he did not intend to commit robbery when he went to the house, but intended only to recover the money he was owed. [Citation.] Over the defendant's objection, the prosecutor was permitted to argue to the jury that a robbery had been committed even if the defendant honestly believed the victim owed him money. [Citation.] The jury convicted the defendant of first degree felony murder and fixed the penalty at death.

"A majority of this court reversed, concluding: 'Although an intent to steal may ordinarily be inferred when one person takes the property of another, particularly if he takes it by force, proof of the existence of a state of mind incompatible with an intent to steal precludes a finding of either theft or robbery. It has long been the rule in this state and generally throughout the country that a bona fide belief, even though mistakenly held, that one has a right or claim to the property negates felonious intent. [Citations.] A belief that the property taken belongs to the taker [citations], or that he had a right to retake goods sold [citation] is sufficient to preclude felonious intent. Felonious intent exists only if the actor intends to take the property of another without believing in good faith that he has a right or claim to it. [Citation.]' [Citation.]" (*People* v. *Barnett* (1998) 17 Cal.4th 1044, 1142-1143 [74 Cal.Rptr.2d 121, 954 P.2d 384] (*Barnett*).)

a. *Sufficient evidence supported the giving of a claim-of-right instruction*

██ At the threshold we must determine whether the evidence warranted the giving of a claim-of-right instruction in the first instance. The Court of Appeal found that it did. We agree.

Defendant's account of the source of the $200 in the victim's residence during the criminal episode, and the manner in which he allegedly took it

back upon fleeing from the residence, was sharply at odds with the victim's and victim's mother's testimony. Notably, however, it was defendant's testimony, not Shelly's or Josephine's, that most directly established a *forcible* taking of the $200 from the person of the victim: defendant claimed Shelly picked up the money and put it in her bra, and that he forcibly grabbed the money from her bra moments before he fled from the residence, whereas Josephine testified defendant took the money from the coffee table as he was fleeing.

Generally, "[a] party is not entitled to an instruction on a theory for which there is no supporting evidence." (*People v. Memro* (1995) 11 Cal.4th 786, 868 [47 Cal.Rptr.2d 219, 905 P.2d 1305].) "[A] trial court is not required to instruct on a claim-of-right defense unless there is evidence to support an inference that [the defendant] acted with a subjective belief he or she had a lawful claim on the property." (*People v. Romo* (1990) 220 Cal.App.3d 514, 519 [269 Cal.Rptr. 440], italics omitted; *Barnett, supra,* 17 Cal.4th at p. 1145.)

Here, defendant's own testimony constituted such evidence. He claimed he brought the $200 into the residence to give to Shelly to pay bills and took it back upon concluding she was not going to use it for that purpose but would instead give it to her mother. He produced a witness (Hermasi Latu) who testified defendant had been paid $200 in cash on that same day. As explained, the prosecution did not attempt to argue that if defendant's testimony that he brought $200 into the residence was believed, there was further evidence that the $200 he took upon fleeing was different currency.

█ " 'In evaluating the evidence to determine whether a requested instruction should be given, the trial court should not measure its substantiality by weighing the credibility [of the witnesses] . . . . Doubts as to the sufficiency of the evidence to warrant instructions should be resolved in favor of the accused. [Citations.]' (*People v. Duckett* (1984) 162 Cal.App.3d 1115, 1125 [209 Cal.Rptr. 96].)" (*People v. Romo, supra,* 220 Cal.App.3d at p. 519.) In *Barnett,* we evaluated the necessity of giving a claim-of-right instruction under the defendant's account of events. (*Barnett, supra,* 17 Cal.4th at p. 1145, fn. 69.)

In *Butler* we observed that a forcible taking of property from another "ordinarily" allows an inference of an intent to steal, as opposed to a claim of right. (*Butler, supra,* 65 Cal.2d at p. 573.) █ Here, however, if defendant's version of the events was believed, even his self-admitted use of force did not preclude his raising a claim-of-right defense to the robbery charge, given his further testimony that he brought $200 into the victim's

home and took back the same currency upon fleeing. Although defendant's and the victim's respective versions of the events differed considerably, defendant's testimony, together with that of the other defense witnesses, constituted sufficient evidence to warrant the giving of a claim-of-right instruction.[2]

 b. *A good faith claim of right to title or ownership of specific property taken from another can negate the element of felonious taking (a taking accomplished with intent to steal) necessary to establish theft (§ 484) or robbery (§ 211)*

██ At common law, claim of right was recognized as a defense to the crime of larceny because it was deemed to negate the *animus furandi*—or felonious intent to steal—of that offense. (See 4 Blackstone, *supra*, at p. 230.) Because robbery was viewed as simply an aggravated form of larceny, it was likewise subject to the same claim-of-right defense. (4 Blackstone, *supra*, at pp. 241-243.)

When the Legislature created the first statutory scheme codifying this state's criminal law in 1850, it incorporated portions of the then-existing common law into the new statutes. Thus, the 1850 robbery statute (Stats. 1850, ch. 99, § 59, p. 235) closely tracked the definition of robbery set out in Blackstone's Commentaries. (Compare § 59 of the Crimes and Punishments Act of 1850 ["Robbery is the *felonious* and violent *taking* of money, goods, or other valuable thing from the person of another, by force or intimidation." (Stats. 1850, ch. 99, § 59, p. 235, italics added.)], with 4 Blackstone, *supra*,

---

[2]In *Barnett* we concluded that "when taken as a whole and viewed most favorably toward defendant, the evidence supporting a claim-of-right defense in this case was 'minimal and insubstantial.' (*People* v. *Romo, supra,* 220 Cal.App.3d at p. 519; *People* v. *Alvarado* [(1982)] 133 Cal.App.3d [1003,] 1021 [184 Cal.Rptr. 483].)" (*Barnett, supra,* 17 Cal.4th at p. 1146.) The facts of *Barnett, Romo,* and *Alvarado* are distinguishable from those in this case. In *Barnett* the defendant testified and accused murder-robbery victim Eggett of having stolen gold from him during their joint gold-mining venture the previous year. We characterized Barnett's claim of right as "amount[ing] to no more than a rough estimate of a disputed debt" (*ibid.*) and observed he had seized items of value that had been placed on the hood of the vehicle by the robbery victims which could have come from a victim other than Eggett. (*Id.* at p. 1145.) *Romo* involved a charge of grand theft, not robbery, the defendant did not testify, and there was no evidence to support a claim of right other than a suggestion in the testimony of an investigating officer that defendant may have taken the victim's property as revenge for an earlier act of vandalism. (*People* v. *Romo, supra,* 220 Cal.App.3d at pp. 516-517.) In *Alvarado*, the defendant and others had indiscriminately taken items of value during a burglary/attempted robbery that did not specifically relate in any way to the supposed claim of right which was itself only suggested by the testimony of defendant's mother. (*People* v. *Alvarado* (1982) 133 Cal.App.3d 1003, 1021-1022 [184 Cal.Rptr. 483].) Here the testimony of defendant, Hermasi Latu, and the other defense witnesses was more than minimal and insubstantial and would have supported the giving of a claim-of-right instruction.

at p. 242 [robbery "is the *felonious* and forceful *taking* from the person of another of goods or money to any value, by violence or putting him in fear" (italics added)].) From this historical perspective alone, it can be inferred that the Legislature intended to incorporate the common law recognition of the defense of claim of right as negating the felonious taking or *animus furandi* element common to theft and robbery when it first codified those offenses in the 1850 statutes.[3]

Moreover, the fact that the Legislature used the same terminology, i.e., "felonious taking," in both the larceny and robbery statutes of 1850 (Stats. 1850, ch. 99, §§ 59, 60-61, p. 235) most reasonably indicates an intent to ascribe the same meaning to that element which is common to both offenses, that is, recognition of the common law claim-of-right defense as applying to both theft and robbery. Put differently, by adopting the identical phrase "felonious taking" as used in the common law with regard to both offenses, the Legislature in all likelihood intended to incorporate the same meanings attached to those phrases at common law. (See *Harris* v. *Reynolds* (1859) 13 Cal. 514, 518.)

Thirteen years later, in *People v. Vice* (1863) 21 Cal. 344, 345 (*Vice*), this court held that property feloniously taken must belong to someone other than the defendant in order to constitute robbery: "The owner of property is not guilty of robbery in taking it from the person of the possessor, though he may be guilty of another public offense." (*Ibid.*) *Vice* held that an indictment charging robbery was deficient for failing to affirmatively allege that the property did not belong to the defendant. (*Id.* at p. 345.) In so holding, the *Vice* court looked to the actual title or ownership of the property taken and essentially read into the 1850 robbery statute (Stats. 1850, ch. 99, § 59, p. 235) an affirmative requirement, derived from the common law rule of larceny, that the thief (or robber) must take property belonging to someone other than himself ("another") in order to be guilty of robbery. (See also *People* v. *Schuler* (1865) 28 Cal. 490, 492-494 [following *Vice*].) Similarly, this court found the same common law rule applicable to the 1850 theft statutes (Stats. 1850, ch. 99, §§ 60-61, p. 235). (See *People* v. *Stone* (1860) 16 Cal. 369, 371 ["It is not every trespass that is a larceny. The felony is in the intent to appropriate another's property, *the taker knowing that he had no right or claim to it.*" (Italics added.)]; accord, *People* v. *McKinley* (1858) 9 Cal. 250, 251.)

In 1872, nine years after *Vice* was decided, the Legislature enacted the first comprehensive Penal Code establishing a finite list of crimes punishable

---

[3]The 1850 theft statute provided that persons "who shall *feloniously* steal, *take* and carry, lead or drive away the personal goods or property of another" (italics added) were guilty of theft. (Stats. 1850, ch. 99, §§ 60-61, p. 235.)

under California law. As part of this complete codification, the Legislature enacted section 211, the current robbery provision which has remained unchanged since first enacted 127 years ago. Section 211 provides: "Robbery is the *felonious taking* of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear." (Italics added.) As with the 1850 robbery statute (Stats. 1850, ch. 99, § 59, p. 235), the most logical inference is that by use of the identical term "felonious taking" in section 211, the Legislature was yet again incorporating into the 1872 robbery statute the affirmative requirement, derived from the common law rule applicable to larceny and robbery, that the thief or robber has to intend to take property belonging to someone other than himself in order to be guilty of theft or robbery, that is to say, the common law recognition of the defense of claim of right.

Decisions, including those of this court, postdating the 1872 codification of the crime of robbery in section 211, continued to follow the 1863 holding in *Vice, supra,* 21 Cal. 344, to wit, that the earlier robbery statute had incorporated the common law rule that a felonious taking does not occur when the defendant has a good faith claim of right to the specific property taken. (See, e.g., *People* v. *Hicks* (1884) 66 Cal. 103, 104 [4 P. 1093] [information charging robbery not deficient because it sufficiently identified owner of property as other than defendant]; *People* v. *Anderson* (1889) 80 Cal. 205, 206-207 [22 P. 139] [same]; see also *People* v. *Rosen* (1938) 11 Cal.2d 147, 150 [78 P.2d 727, 116 A.L.R. 991]; *People* v. *Sheasbey* (1927) 82 Cal.App. 459 [255 P. 836].)

Also significant is a note accompanying section 211 in the first annotated edition of the 1872 Penal Code that plainly reflects the Legislature's intent to incorporate the common law claim-of-right defense as part and parcel of the *animus furandi* element found in the current robbery statute. The note cites this court's decision in *Vice, supra,* 21 Cal. 344, for the proposition that "the owner of property is not guilty of robbery in taking it from the possession of the possessor." (Code comrs. note foll. Ann. Pen. Code § 211 (1st ed. 1872 Haymond & Burch, comrs.-annotators) p. 99.)

As recently as last year, in *People* v. *Davis* (1998) 19 Cal.4th 301 [79 Cal.Rptr.2d 295, 965 P.2d 1165], in the course of discussing the elements of larceny, we cited Perkins and Boyce, Criminal Law (3d ed. 1982) at pages 326-327 (Perkins), for the well-settled principle that "The intent to steal or *animus furandi* is the intent, *without a good faith claim of right*, to permanently deprive the owner of possession." (19 Cal.4th at p. 305, second italics added.)

Lastly, it has long been recognized that " ' "[t]heft is a lesser included offense of robbery, which includes the additional element of force or

fear," [Citation.]' (*People* v. *Bradford* (1997) 14 Cal.4th 1005, 1055 [60 Cal.Rptr.2d 225, 929 P.2d 544])" (*People* v. *Ortega* (1998) 19 Cal.4th 686, 694 [80 Cal.Rptr.2d 489, 968 P.2d 48]), and that robbery " 'is a species of aggravated larceny.' " (*Ibid.*, citing Perkins, *supra*, at p. 350.) A conclusion here that a claim of right, for policy reasons, should no longer be recognized as a defense to robbery—even where the defendant can establish that he is taking back specific property to which he has lawful title or a bona fide claim of ownership—would mean such a defendant could be convicted of robbery *based on theft of his own property*, a proposition that would stand in patent conflict with both the commonsense notion that someone cannot steal his own property, and the corollary rule that "theft," the taking of "the personal property of *another*" (§ 484, italics added), is a lesser included offense at the core of every robbery. Wholesale elimination of the claim-of-right defense in such cases would stand in sharp conflict with these basic legal principles, principles that have their roots in the early common law, have recently been affirmed by this court, and have never seriously been questioned as a matter of California law.

The People make several additional arguments in support of their position that there is a sound legal basis for eliminating the claim-of-right defense to robbery in its entirety, none of which we find persuasive. They argue that upon enactment of section 211 in the Penal Code of 1872, the reclassification of robbery as a *crime against the person*, whereas larceny remained classified as a *crime against property* (compare Pen. Code, pt. 1, tit. 8 [Of Crimes Against The Person] with Pen. Code, pt. 1, tit. 13 [Of Crimes Against Property]), reflects the Legislature's belief that the predominant characteristic of robbery for purposes of assessing culpability and punishment, and for effectuating deterrence under our criminal statutory scheme, is the use of force or fear, rather than the taking of personal property. But the fact remains that a felonious taking, that is, a taking done with the intent to steal another's property, is a required element at the core of every robbery, and the fact that robbery is chaptered along with other crimes against the person in the Penal Code does not mean it does not share common elements of crimes against property as well. Moreover, section 10004, enacted in 1941, provides that "Division, chapter, article, and section headings contained [in the Penal Code] shall not be deemed to govern, limit, modify or in any manner affect the scope, meaning or intent of the provisions of any division, chapter, article or section hereof." (See also *People* v. *Nichols* (1970) 3 Cal.3d 150, 158 [89 Cal.Rptr. 721, 474 P.2d 673].)

The People also observe that "[c]ommentators who favor retention of the claim of right defense for robbery have attempted to counter the compelling public policy concerns regarding the use of self-help involving violence or

threat of violence by suggesting that even if the defendant could successfully argue that he was acting under an actual claim of right and therefore did not commit robbery, he would still face criminal liability, namely he would be guilty of assault. (See, e.g., 2 LaFave & Scott, Substantive Criminal Law (1986) § 8.11(b), p. 442 ['Of course, one who collects debts or borrows property or perpetrates jokes by use of violence or intimidation, though he is not guilty of robbery, need not go free: for he is guilty of at least simple battery if he uses force, and of simple assault if he uses intimidation, and of aggravated assault or battery (e.g., assault with a deadly weapon) under appropriate circumstances.' (fns. omitted.)].)" The People disagree with the reasoning of such commentators and urge that this "rationalization represents a fundamental misapprehension of California jurisprudence" because "under California law assault is not a lesser included offense of robbery." The People assert that some robberies may be committed through use of force or threats of violence that would not be independently actionable as assault if a claim-of-right defense otherwise applied to preclude conviction of robbery, such as where the defendant robs another with a toy gun, unloaded gun, or simulated gun, which fact would support a conviction of robbery but not assault. (See *People* v. *Wolcott* (1983) 34 Cal.3d 92, 98-100 [192 Cal.Rptr. 748, 665 P.2d 520] ["[B]ecause a defendant can commit robbery without attempting to inflict violent injury, and without the present ability to do so, robbery does not include assault as a lesser offense."].)

The point is unavailing for purposes of deciding the issue before us. We think it unlikely a large number of defendants charged with robbery will have a bona fide claim of right in the actual ownership of or title to the property taken from the person of the victim. In many if not most such cases, as in the instant case, the defendant likely will have committed various separately chargeable assaultive crimes through utilization of the force or fear necessary to support the charge of robbery. Here, for example, in addition to the charged robbery, defendant was convicted of battery, spousal abuse, and making terrorist threats. Simple or aggravated assault and false imprisonment also come readily to mind as charges that might be brought against persons who use unlawful force in seeking to take back property they in good faith believe belongs to them. None of these crimes is a lesser included offense of robbery; this does not lessen their availability to charge a robbery suspect for the use of unlawful force or threats of violence. It is difficult to hypothesize facts whereby a defendant who has used sufficient force or threats of violence to regain what he in good faith believes is his own property, thereby exposing himself to a charge of robbery but also possibly qualifying him to interpose a claim-of-right defense, has not also acted in a sufficiently forceful, violent or threatening manner as would separately expose him to prosecution and punishment for assaultive conduct against the robbery victim.

In sum, we find that the Legislature over 100 years ago codified in the current robbery statute the common law recognition that a claim-of-right defense can negate the *animus furandi* element of robbery where the defendant is seeking to regain specific property in which he in good faith believes he has a bona fide claim of ownership or title. Whatever be our views on the wisdom of the Legislature's chosen delineation of the mental state necessary for robbery, the separation of powers clause (Cal. Const., art. III, § 3) prohibits this court from abolishing the claim-of-right defense altogether on policy grounds, as such would effectively alter a statutorily defined element of that offense by judicial fiat. The Legislature of course remains free to amend section 211 to preclude a claim-of-right defense in robbery prosecutions. The question whether such amendment would better reflect sound public policy is one properly addressed to that body rather than to this court.

c. *Expansion of the claim-of-right defense to robberies perpetrated to satisfy, settle or collect on a debt*

As noted above (*ante*, at p. 943), *Butler* broadly held that "a bona fide belief, even though mistakenly held, that one has a right or claim to the property [taken in a robbery] negates felonious intent [Citations.]." (*Butler, supra*, 65 Cal.2d at p. 573, fn. omitted.) *Butler* was a felony-murder case in which the defendant, a former employee of the victim, believed the victim owed him money, went armed with a gun to the victim's home "to collect payment," shot and killed the victim (and also shot another person present in the victim's home) during an ensuing scuffle, searched the home for money and found none, and finally "took a wallet and ran from the house." (*Id.* at p. 572.) The *Butler* court reversed defendant's murder conviction, concluding a claim-of-right defense could negate the felonious intent required for robbery on those facts.

In furtherance of the public policy of discouraging the use of forcible self-help, a majority of cases from other jurisdictions decided after *Butler* that have addressed the question whether claim of right should be available as a defense to robbery have rejected *Butler*'s expansive holding that a good faith belief by a defendant that he was entitled to the money or possessions of the victim to satisfy or collect on a debt is a defense to robbery. (See *Whitescarver* v. *State* (Alaska Ct.App. 1998) 962 P.2d 192, 194-196; *State* v. *Self* (1986) 42 Wn.App. 654 [713 P.2d 142] [rejecting majority rationale in *Butler*]; *Hamby* v. *State* (1992) 206 Ga.App. 791 [426 S.E.2d 670, 671-672]; *State* v. *Mejia* (1995) 141 N.J. 475 [662 A.2d 308, 320]; *State* v. *Schaefer* (1990) 163 Ariz. 626 [790 P.2d 281, 283-285]; *In re Hammer* (1988) 139 Misc.2d 782 [528 N.Y.S.2d 784, 785]; *People* v. *Reid* (1987) 69 N.Y.2d 469 [515 N.Y.S.2d 750, 508 N.E.2d 661, 663-665]; *People* v. *Hodges* (1985) 113

A.D.2d 514 [496 N.Y.S.2d 771, 774] [rejecting majority rationale in *Butler*]; *Com.* v. *Sleighter* (1981) 495 Pa. 262 [433 A.2d 469, 471-472] (plur. opn.); *State* v. *Brighter* (1980) 62 Hawaii 25 [608 P.2d 855, 858-860]; *Com.* v. *Dombrauskas* (1980) 274 Pa.Super. 452 [418 A.2d 493] [citing with approval Justice Mosk's dissent in *Butler*]; *State* v. *Russell* (1975) 217 Kan. 481 [536 P.2d 1392]; *Cates* v. *State* (1974) 21 Md.App. 363 [320 A.2d 75, 77 A.L.R.3d 1353] [citing with approval Justice Mosk's dissent in *Butler*]; *Crawford* v. *State* (Tex.Crim.App. 1974) 509 S.W.2d 582; *State* v. *Martin* (1973) 15 Or.App. 498 [516 P.2d 753, 88 A.L.R.3d 1302]; *Edwards* v. *State* (1970) 49 Wis. 2d 105 [181 N.W.2d 383]; *People* v. *Uselding* (1969) 107 Ill.App.2d 305 [247 N.E.2d 35]; *Elliott* v. *State* (1970) 2 Tenn.Crim. 418 [454 S.W.2d 187, 188]; but see *State* v. *Snowden* (1982) 7 Ohio App.3d 358 [455 N.E.2d 1058, 1065] [following *Butler*]; *Com.* v. *Larmey* (1982) 14 Mass.App. 281 [438 N.E.2d 382]; *People* v. *Holcomb* (1975) 395 Mich. 326 [235 N.W.2d 343, 345-346] [following *Butler*].)

In *Barnett, supra,* 17 Cal.4th 1044, we confronted claims of instructional error, ineffective assistance of counsel and prosecutorial misconduct stemming from the trial court's failure to instruct on a claim-of-right defense as to one of two robbery victims in a capital case in which a robbery-murder special circumstance was alleged. After reviewing the rationale and holding of *Butler, supra,* 65 Cal.2d 569 (see *ante,* at p. 943 ), we made the following observations regarding the policy implications of permitting a claim-of-right defense to robbery:

"In his dissent in *Butler,* Justice Mosk took a dim view of the majority's apparent authorization of armed robbery as a self-help measure. Pointing out that the statutory provision defining robbery (§ 211) raised no issue of ownership of property forcibly taken, but only its possession, Justice Mosk saw no statutory basis for the defense. [Citation.] Moreover, noting that the leading cases permitting forcible recapture of property were all decided before the turn of the century, Justice Mosk concluded that a six-shooter was no longer 'an acceptable device for do-it-yourself debt collection' and that the 'might-makes-right' doctrine of the previous century was of 'dubious adaptability' to modern times. [Citation.] [¶] Since *Butler, supra,* 65 Cal.2d 569, was decided, a number of other jurisdictions have rejected the claim-of-right defense for public policy reasons in cases where force, violence, or weapons are used for self-help debt collection. [Citations.] As several courts have observed, the proposition that a claim of right negates the felonious intent in robbery ' "not only is lacking in sound reason and logic, but it is utterly incompatible with and has no place in an ordered and orderly society such as ours, which eschews self-help through violence. Adoption of the proposition would be but one step short of accepting lawless reprisal as an

appropriate means of redressing grievances, real or fancied." ' [Citations.]" (*Barnett, supra,* 17 Cal.4th at pp. 1143-1144.)

In *Barnett* we were not asked by the People "to revisit *Butler*'s increasingly anachronistic authorization of the claim-of-right defense in the context of armed robbery." (*Barnett, supra,* 17 Cal.4th at p. 1146.) However, noting "the obvious public policy reasons for strictly circumscribing the circumstances under which persons should be permitted *to enforce their debt demands* at gunpoint [citations], we conclude[d] the defense is not available *where the claimed debt* is uncertain and subject to dispute." (*Ibid.,* italics added.)

The People in this case urge that "[t]he rationale for declining to permit a defendant to assert a claim of right defense in a robbery case is quite simple: An ordered society founded on the rule of law does not countenance self-help when it is accomplished by the use of fear, intimidation, or violence."

Justice Mosk espoused a similar viewpoint in regard to the *Butler* majority's application of the claim-of-right defense to the facts there in issue: "[T]he question is ultimately one of basic public policy, which unequivocally dictates that the proper forum for resolving *debt disputes* is a court of law, pursuant to legal process—not the street, at the business end of a lethal weapon. Had this defendant been entrusted with the contents of the deceased's wallet, and had he appropriated them to his own use, believing he was entitled to keep the funds in payment of wages or a debt, that belief would have furnished him no defense to a charge of embezzlement (Pen. Code, § 511; *People* v. *Proctor* (1959) 169 Cal.App.2d 269, 277 [337 P.2d 93]). By parity of rationale, the claim of offset denied to the trusted employee who dips into the company cashbox should be denied to one who, like this defendant, enforces his demands at gunpoint. To hold otherwise would be to constitute him judge and jury in his own cause." (*Butler, supra,* 65 Cal.2d at p. 577 (dis. opn. of Mosk, J.), italics added.)[4]

" 'It is a general principle that one who is or believes he is injured or deprived of what he is lawfully entitled to must apply to the state for help.

---

[4]Section 511, cited by Justice Mosk in his dissent in *Butler*, draws this very distinction in declaring "claim of title a ground of defense" to embezzlement. It provides: "Upon any indictment for embezzlement, it is a sufficient defense that the property was appropriated openly and avowedly, and under a claim of title preferred in good faith, even though such claim is untenable. *But this provision does not excuse the unlawful retention of the property of another to offset or pay demands held against him.*" (Italics added.) Arguably, the Legislature in 1927 expanded the statutory basis of the claim-of-right defense for embezzlement to all theft-related offenses when it enacted section 490a, which provides, "Wherever any law or statute of this state refers to or mentions larceny, embezzlement, or stealing, said law or statute shall hereafter be read and interpreted as if the word 'theft' were substituted therefor." (See *People* v. *Romo, supra,* 220 Cal.App.3d at pp. 518-519 [suggesting applicability of

Self-help is in conflict with the very idea of social order. It subjects the weaker to risk of the arbitrary will or mistaken belief of the stronger. Hence the law in general forbids it.' " (*Daluiso* v. *Boone* (1969) 71 Cal.2d 484, 500 [78 Cal.Rptr. 707, 455 P.2d 811], quoting 5 Pound, Jurisprudence (1959) § 142, pp. 351-352.)

In *State* v. *Ortiz* (1973) 124 N.J.Super. 189 [305 A.2d 800], the New Jersey appellate court quoted the holding in *Butler* and criticized the decision for failing to acknowledge the fundamental policy against encouraging resort to force, fear, or violence to gain possession of money or goods, even when acting under a claim of right. The *Ortiz* court observed that, "A review of the authorities . . . reveals that the proposition so espoused by the California court is little more than a relic of days long past, which did not then and does not now enjoy anything like the universal acceptance suggested by the sweeping language of the majority opinion in *Butler*." (*Id.* at p. 801.) The *Ortiz* court found that allowing a claim-of-right defense to robbery, as provided in *Butler*, was antithetical to an "ordered and orderly society," and concluded by "reject[ing] . . . out of hand" the availability of the defense to robbery. (*Id.* at p. 802.)

In *State* v. *Mejia, supra,* 662 A.2d 308 (*Mejia*), the New Jersey Supreme Court quoted the decision in *State* v. *Ortiz* and concluded, in part "for sound reasons of public policy," that the New Jersey Legislature, in enacting a statutory claim-of-right defense to *theft*, did not intend to extend that affirmative defense to robbery. (*Id.* at pp. 319, 320.)

The legitimacy of the need for our laws to discourage forcible or violent self-help as a remedy seems beyond question. Defendant himself acknowledges the strong public policy considerations militating against retention of the claim-of-right defense for robbery. Unlike the court in *Mejia, supra,* 662 A.2d 308, however, we have concluded that California's Legislature incorporated the common law claim-of-right doctrine into the statutorily defined mens rea element of robbery when it codified that offense over 100 years ago, and that consequently, we are not free to judicially abolish it and thereby effectively expand the statutory definition of the crime. (§ 6; *In re Brown, supra,* 9 Cal.3d at p. 624.)[5]

We nonetheless conclude that *Butler* went well beyond the basic underlying notion that a thief or robber must intend to steal *another's*

section 511 to theft cases]; *People* v. *Holmes* (1970) 5 Cal.App.3d 21, 24-25 [84 Cal.Rptr. 889] [same].) Consequently, section 511 may be read as providing a statutory claim-of-right defense to all theft-related charges, as broadened from embezzlement through the provisions of section 490a.

[5]It should be noted that many of the out-of-state decisions rejecting claim of right as a defense to robbery in its entirety were interpreting statutory provisions and legislative history very different from that which we face in this case. (See, e.g., *Mejia, supra,* 662 A.2d at p.

property when, on the facts before it, the court extended the availability of a claim-of-right defense to perpetrators who rob their victims assertedly to settle, satisfy, or otherwise collect on a debt. Specifically, we find nothing in the language of section 211 to suggest the Legislature intended to incorporate such a broad and expansive extension of the claim-of-right doctrine into the robbery statute.

Many of the out-of-state decisions that have rejected *Butler*'s expansive extension of the claim-of-right defense to so-called "debt collection" robbery cases have retained it as a viable defense where the defendant takes *specific property* in which he has a bona fide claim of ownership or title. (See, e.g., *Edwards* v. *State, supra,* 181 N.W.2d at p. 388; accord, *State* v. *Self, supra,* 713 P.2d at p. 144; *State* v. *Winston* (1982) 170 W.Va. 555 [295 S.E.2d 46, 51]; *State* v. *Russell, supra,* 536 P.2d at pp. 1393-1394; *State* v. *Martin, supra,* 516 P.2d at p. 755.)

The Wisconsin Supreme Court in *Edwards* v. *State, supra,* 181 N.W.2d at page 388, cogently set forth the rationale for rejecting a claim-of-right defense to robberies involving forcible debt collection: "The distinction between specific personal property and money in general is important. A debtor can owe another $150 but the $150 in the debtor's pocket is not the specific property of the creditor. One has the intention to steal when he takes money from another's possession against the possessor's consent even

320 [the legislative history of the pertinent New Jersey statute "evinces a legislative intent to withhold a claim-of-right defense from those who threaten others with physical harm"]; *People* v. *Hodges, supra,* 496 N.Y.S.2d at p. 773 [legislative history of pertinent New York statute reflects legislative intent to limit claim-of-right defense to larceny and not robbery]; *People* v. *Uselding, supra,* 247 N.E.2d at pp. 37-38 [Illinois legislature departed from common law in proscribing all forcible takings rather than felonious takings, precluding claim-of-right defense to robbery].)

We note further that both this court and the intermediate appellate courts of this state have already placed significant policy limitations on the claim-of-right defense to robbery. The courts have indicated that the defense may not be raised when the defendant is attempting to collect on an *unliquidated* debt or damages claim. (See, e.g., *Barnett, supra,* 17 Cal.4th at p. 1146 ["claimed debt is uncertain and subject to dispute"]; *People* v. *Holmes, supra,* 5 Cal.App.3d at p. 24 [unliquidated contract claim]; *People* v. *Poindexter* (1967) 255 Cal.App.2d 566, 570 [63 Cal.Rptr. 332] [unliquidated tort claim for personal injuries].) This court has also held that the defense is not available where the claim of right to the property is founded in a "notoriously illegal" transaction. (*People* v. *Hendricks* (1988) 44 Cal.3d 635, 642 [244 Cal.Rptr. 181, 749 P.2d 836] [fee collection for prostitution services]; *People* v. *Gates* (1987) 43 Cal.3d 1168, 1182 [240 Cal.Rptr. 666, 743 P.2d 301] [distribution of proceeds from forgery ring]; see also *People* v. *Johnson* (1991) 233 Cal.App.3d 425, 457-458 [284 Cal.Rptr. 579] [payment for a drug deal].) The rationale and holdings of these decisions do not contravene our conclusion in this case that the availability of the claim-of-right defense to robbery was envisioned by the Legislature and incorporated into the statutory definition of that offense (§ 211), for robberies in which the defendant sought to recover specific property for which he believed in good faith he had a bona fide claim of ownership or title, that is, a recognition that one cannot feloniously intend to steal one's own property.

though he also intends to apply the stolen money to a debt. The efficacy of self-help by force to enforce a bona fide claim for money does not negate the intent to commit robbery. Can one break into a bank and take money so long as he does not take more than the balance in his savings or checking account? Under the majority rule [as it then existed, allowing a claim of right defense to any robbery] the accused must make change to be sure he collects no more than the amount he believes is due him on the debt. A debt is a relationship and in respect to money seldom finds itself embedded in specific coins and currency of the realm. Consequently, taking money from a debtor by force to pay a debt is robbery. The creditor has no such right of appropriation and allocation."

We agree with the rationale of *Edwards* v. *State, supra,* 181 N.W.2d 383, and similar decisions drawing a distinction for debt collection cases. Indeed, the *Butler* majority appears to have overlooked this court's earlier decision in *People* v. *Beggs* (1918) 178 Cal. 79 [172 P. 152] (*Beggs*), an extortion case (§ 518) in which we explained that because of the strong public policy militating against self-help by force or fear, courts will not recognize a good faith defense to the satisfaction of a debt when accomplished by the use of force or fear.

In *Beggs*, the victim was caught stealing goods from a store owner and charged with petit larceny. Defendant, who was the store owner's lawyer, then met with the victim and informed him he would have the charges dismissed if the victim paid the store owner $2,000 as compensation for the theft, otherwise the victim would face seven or ten years in prison and "could be sent to San Quentin." (178 Cal. at p. 81.) Based on the fear induced by this threat, the victim paid the $2,000 which was shared by defendant and the store owner. Defendant was thereafter charged with and convicted of extortion. (*Ibid.*)

On appeal, defendant claimed the trial court erred in denying his defense of good faith. This court rejected the claim, noting that section 518 then provided, "Extortion is the obtaining of property from another, with his consent, induced by a wrongful use of force or fear, or under color of official right." (*Beggs, supra,* 178 Cal. at pp. 82-83.) In concluding the phrase "wrongful use of force or fear" did not allow for a defense that the defendant had a good faith belief that the use of force or fear was permissible or justified, the court in *Beggs* explained: "In reading section 518 with sections 519, 523, and 650, we cannot escape the conclusion that, assuming [the victim] had in fact stolen goods of the value of two thousand dollars from [the store owner], the threats made by defendant to prosecute [the victim] therefor unless he paid the value of said goods, which sum of two thousand

dollars the latter, by reason of fear induced by such threat, paid, constitutes the crime of extortion. *It is the means employed which the law denounces,* and though the purpose may be to collect a just indebtedness arising from and created by the criminal act for which the threat is to prosecute the wrong-doer, it is nevertheless within the statutory inhibition. *The law does not contemplate the use of criminal process as a means of collecting a debt. To invoke such process for the purpose named is, as held by all authorities, contrary to public policy. Hence, good faith, or the fact that the end accomplished by such means is rightful, cannot avail one as a defense in such prosecution, any more than such facts would constitute a defense where one compels payment of a just debt by the threat to do an unlawful injury to the person of his debtor."* (*Beggs, supra,* 178 Cal. at p. 84, italics added.)

We therefore hold that to the extent *Butler, supra,* 65 Cal.2d 569, extended the claim-of-right defense to robberies perpetrated to satisfy, settle or otherwise collect on a debt, liquidated or unliquidated—as opposed to forcible takings intended to recover specific personal property in which the defendant in good faith believes he has a bona fide claim of ownership or title—it is unsupported by the statutory language, further contrary to sound public policy, and in that regard is overruled.

### d. *Ex post facto and harmless error*

In light of our holding, we have no occasion to address defendant's claim that judicial abolishment of the claim-of-right defense, if applied retroactively to his case, would violate the ex post facto clause and his right to due process under the Fifth Amendment. Although the *source* of the $200 taken during the robbery in this case was sharply contested—defendant claiming he brought it into the victim's home and conditionally offered it to her to use to pay bills, then took it back upon concluding she was going to give it to her mother; the victim and her mother in turn claiming the mother had brought it into the home and that defendant simply stole it from them—defendant never claimed he took $200 of like currency from the victim or the victim's mother in satisfaction of the debt, nor did the prosecution argue that, if defendant was believed, he did other than forcibly take back the same $200 in currency he brought into the home in the first instance. Defendant's testimony was that the victim had placed the $200 in her bra at some point, and that he grabbed it back from her person before fleeing from the residence. Given these facts, if the jury, properly instructed, believed defendant's testimony, then under *Butler* and our holding in this case, defendant's actions in seeking to recover from the victim, albeit with force, what he believed in good faith was his *specific property,* no matter how reprehensible and otherwise unlawful those actions may have been, did not constitute a felonious taking necessary for conviction of robbery.

The People nonetheless urge that any error by the trial court in refusing to instruct the jury on a claim-of-right defense was harmless since "[i]n the present case, [defendant's] account of the events was sharply at odds with Shelly's testimony regarding the offenses. Critically, the verdicts demonstrate that the jury completely rejected [defendant's] claims." We disagree. Once again, although it is true defendant's account of the incident and his relationship with Shelly at that time differed markedly from that of the victim and her mother, critically, it was *defendant*'s testimony, not the victim's, that directly established his *forcible* taking of the $200 from her person (grabbing the money from her bra) moments before he fled from the residence. The robbery verdict suggests the jury most likely credited at least that aspect of defendant's testimony. We have concluded the evidence would have supported the giving of a claim-of-right instruction. We further conclude the trial court's failure to so instruct the jury cannot be deemed harmless to the robbery conviction on the facts and testimony presented below.

### III. CONCLUSION

The judgment of the Court of Appeal affirming defendant's conviction of robbery is reversed, the judgment affirmed in all other respects, and the matter remanded to that court for further proceedings consistent with the views expressed herein.

George, C. J., Mosk, J., Kennard, J., Werdegar, J., Chin, J., and Brown, J., concurred.