Filed 6/24/24  P. v. Quinnine CA1/5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>v.<br><br>DAVID ANTHONY QUINNINE,<br><br>　　　Defendant and Appellant. | A165902<br><br><br>(San Mateo County Super. Ct. No. 19-NF-015588-A) |

　　　David Anthony Quinnine appeals after a jury convicted him of second degree robbery (Pen. Code, §§ 211, 212.5, subd. (c); count one),[1] theft from an elder or dependent adult (§ 368, subd. (d); count three), and extortion by means of force or threat (§ 520; count six).  Quinnine asserts the trial court committed instructional error by declining to give a mistake-of-fact or claim-of-right instruction.  We find no error and affirm.

**BACKGROUND**

**A.**

　　　In 2017, Lucy M. died, leaving behind, among others, her husband of almost 40 years, David M., and her nephew, Quinnine.  At the time of her death, Lucy held five Charles Schwab brokerage accounts.  Those accounts were transferred to

---

[1] Undesignated statutory references are to the Penal Code.

1

David's ownership—who was designated as Lucy's sole primary beneficiary—on Lucy's death.

In late 2018, David broke his hip and had partial hip replacement surgery. Due to this injury and an earlier traumatic brain injury, David was in a wheelchair and needed help with daily activities. In early 2019, he hired Quinnine, who was trained as a nurse, to act as his caregiver. David paid Quinnine $500 per week. Initially, all went well. However, within a few months, Quinnine became aggressive and unkind toward David.

David testified that, on May 10, 2019 (when David was 65 years old), Quinnine stormed into his bedroom, smelling of alcohol, and with a "really evil" look in his eyes. Quinnine held a metal "reacher" tool—which David used to pick up objects that he was otherwise unable to reach—to David's throat and demanded to know how much money was in the Charles Schwab accounts Lucy had left him. Quinnine expressed his belief that the money in Lucy's former Charles Schwab accounts was to be split four ways between himself, his two siblings, and David. David had never heard Lucy make any such promise.

Fearing for his life, David told Quinnine how much was then in the accounts. Quinnine then demanded David give him $700,000—which was more than one quarter of the total amount in the accounts. Quinnine continued to brandish the reacher, saying "don't make me hurt you." Because David felt unable to defend himself and was afraid that he "would die or something terrible would happen" if he did not give Quinnine the money, David wrote Quinnine a check for $700,000.

Quinnine cashed the check that same day, at first depositing it into an account at Bank of America but moving most of it (not long thereafter) to an account at Charles Schwab. Quinnine continued as David's caregiver for a few more weeks and physically abused him on several occasions. Once, Quinnine demanded David give Quinnine's siblings $700,000 each, and hit

David in the face several times when he refused. David did not fire Quinnine or report his behavior to police because he was afraid.

Eventually, Quinnine stopped showing up and David hired a new caregiver, Kevin G. Kevin noticed that David was depressed, and his physical condition was deteriorating. David eventually told Kevin about his problems with Quinnine, including the events of May 10. Later that same day, Kevin (who believed he was a mandated reporter) and David filed a police report.

Police officers executed a search warrant at Quinnine's apartment, and he was arrested. During an interview with a police detective, Quinnine admitted depositing the $700,000 check into his account at Bank of America but falsely denied moving any of it. After his arrest, Quinnine instructed his girlfriend to gradually transfer the remaining money into an account in her name.

**B.**

Quinnine testified that Lucy had practically raised him, and they remained close in adulthood. Shortly after Lucy's death, Quinnine received $46,000 as a primary beneficiary on two of her Vanguard accounts.

According to Quinnine, he never placed the reacher against David's throat or otherwise physically abused David. Quinnine testified that David had voluntarily written the $700,000 check—after only a conversation in which Quinnine threatened to quit and reminded David that Lucy promised that the money in the Charles Schwab accounts would be divided evenly between David, Quinnine, and Quinnine's two siblings. At trial, Quinnine admitted spending, within 10 days of receiving the money, $53,150 on dental implants and $64,818 to pay tax bills.

3

## C.

The jury convicted Quinnine of second degree robbery, theft from an elder or dependent adult, and extortion by means of force or threat. The jury could not reach verdicts on two charged counts of battery on an elder or dependent adult (§ 243.25; counts four & five) and, on the People's motion, the court dismissed a count for criminal threats (§ 422, subd. (a); count two). The jury also could not reach a verdict on an enhancement allegation that Quinnine had personally used a deadly weapon (§ 12022, subd. (b)(1)) in committing counts one and three. The trial court sentenced Quinnine to prison for a term of three years for the robbery and stayed punishment on the other counts.

## DISCUSSION

Quinnine argues that the trial court erred by failing to instruct the jury, with respect to counts one and three, on mistake-of-fact or claim-of-right defenses. We have reviewed his claim of instructional error de novo (*People v. Guiuan* (1998) 18 Cal.4th 558, 569-570), but disagree.

## 1.

Defense counsel asked the trial court to instruct the jury with CALCRIM No. 3406, which provides (with respect to specific intent crimes): "The defendant is not guilty of <insert crime[s]> if (he/she) did not have the intent or mental state required to commit the crime because (he/she) did not know a fact or mistakenly believed a fact. [¶] *If the defendant's conduct would have been lawful under the facts as (he/she) believed them to be,* (he/she) did not commit <insert crime[s]>. [¶] If you find that the defendant believed that <insert alleged mistaken facts>, (he/she) did not have the specific intent or mental state required for <insert crime[s]>. [¶] If you have a reasonable doubt about whether the defendant had the specific intent or mental state

4

required for <insert crime[s]>, you must find (him/her) not guilty of (that crime/those crimes)." (Italics added.)

Defense counsel argued "what prompted Mr. Quinnine to go into the room was a dispute over what he believes is his own property . . . [a]nd so if when he was talking to [David, Quinnine] believed . . . that was his property, then that would negate his specific intent." The trial court denied defense counsel's request, and explained: "To me, that is getting in the claim of right defense through the back door . . . . He's saying he is entitled to the money. In my view, it would make it lawful for him to hold a metal reacher to [David M.'s] neck and make those threats."

**2.**

The trial court was correct in concluding that Quinnine was asserting a claim-of-right defense. (See *People v. Russell* (2006) 144 Cal.App.4th 1415, 1429 ["a claim of right may be based on a mistake of fact regarding the defendant's right to take property"], disapproved on other grounds by *People v. Covarrubias* (2016) 1 Cal.5th 838, 874, & fn. 14.) The claim-of-right doctrine "provides that a defendant's good faith belief, even if mistakenly held, that he has a right or claim to property he takes from another negates the felonious intent necessary for conviction of theft or robbery." (*People v. Tufunga* (1999) 21 Cal.4th 935, 938 (*Tufunga*).)

Our Supreme Court, in *Tufunga, supra,* 21 Cal.4th 935, affirmed the rule that forcible taking of "specific personal property in which the defendant in good faith believes he has a bona fide claim of ownership or title" is not robbery. (*Id.* at p. 956.) But our high court further held that, because of the strong public policy considerations disfavoring forcible self-help (*id.* at pp. 950, 955), the claim-of-right defense does not extend to "robberies perpetrated to satisfy, settle or otherwise collect on a debt, liquidated or unliquidated." (*Id.* at p. 956.)

5

Here, Quinnine did not forcibly recover *specific* personal property from David.  Instead Quinnine himself denied using force but testified that he was accepting fungible money from David's account to collect on debts David purportedly owed.  (See *Tufunga, supra*, 21 Cal.4th at p. 954 [" 'debtor can owe another $ 150 but the $ 150 in the debtor's pocket is not the specific property of the creditor' "].)  In particular, Quinnine testified that Lucy had promised that the assets in the Charles Schwab accounts would be divided evenly between David, Quinnine, and Quinnine's two siblings and that "Dave was supposed to handle it."  Quinnine also testified that the total amount of the check David made out to him ($700,000) represented a quarter of the value of the accounts *plus* an additional $50,000 David owed him under their employment agreement.  Thus, the trial court did not err in concluding that, with respect to count one, even if Quinnine believed in good faith that David owed him some sum of money, that would not absolve him of robbery.  (See *Tufunga,* at pp. 954-956.)

In addition to robbery, Quinnine was also charged with and convicted of theft from an elder or dependent adult (§ 368, subd. (d))—a crime to which a claim-of-right defense could still legally apply.[2]  (*Tufunga, supra*, 21 Cal.4th at pp. 952–953 & fn. 4.)  However, a claim-of-right instruction requires open taking of the property and that no effort was made to conceal the taking.  (See § 511 [property must be "appropriated openly and avowedly"]; *Tufunga,* at p. 952, fn. 4 [claim-of-right negates criminal intent where "the property was appropriated openly and avowedly"].)

Quinnine's taking of the $700,000 was not open.  In fact, the record shows he made efforts to conceal the money—by initially depositing it into one account, transferring most of it to another account at a different bank and then, when arrested,

---

[2] It is undisputed that a claim-of-right defense does not apply to extortion.  (*People v. Lancaster* (2007) 41 Cal.4th 50, 88.)

telling police that all the money remained in the first account while also (undisputedly) instructing his girlfriend to withdraw funds from the second account.  Thus, a claim-of-right defense is unavailable on this record.  The trial court did not err.

### DISPOSITION

The judgment is affirmed.


BURNS, J.

WE CONCUR:


JACKSON, P.J.
SIMONS, J.

*P. v. Quinnine (A165902)*

7