Filed 8/8/16  P. v. Price CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## THIRD APPELLATE DISTRICT

(Yolo)

----

| | |
|---|---|
| THE PEOPLE, | C079325 |
| Plaintiff and Respondent, | (Super. Ct. No. CRF145723) |
| v. | |
| MARISSA WANDA PRICE, | |
| Defendant and Appellant. | |

A jury convicted defendant Marissa Wanda Price of second degree robbery (Pen. Code, §§ 211, 212.5, subd. (c)),[1] carjacking (§ 215, subd. (a)), and unlawfully taking or driving a motor vehicle (Veh. Code, § 10851, subd. (a)).  The trial court placed defendant on three years' formal probation.

---

[1] Undesignated statutory references are to the Penal Code.

On appeal, defendant contends that there is insufficient evidence of an intent to steal to support the robbery conviction.  We shall affirm.

BACKGROUND

Around 6:00 a.m. on November 8, 2014, Adam Hubert started his 1996 Subaru Outback that was parked in the driveway of his Woodland home.  He let the car idle while he went indoors to get his daughter ready for a softball tournament.  The driver's side door was unlocked, while the other car doors were locked.  He routinely left his car idling in the driveway as he got ready to go, and had been "[v]ery comfortable" with this practice.

While brushing his teeth in the bathroom, Hubert heard girls talking in the driveway followed by a car door slamming.  Hubert bolted out of the bathroom to check on his daughter.  When Hubert determined that his daughter was in the house getting ready, he went outside to determine what was taking place.

Hubert swung open the front door and saw his car "backing out of [his] drive, two bikes laying down in the driveway, and a passenger trying to get in to the car and walking alongside of it as it is backing out."  He later identified the person trying to get into the car as codefendant Venessa McKee-Salazar.  Upon seeing Hubert, the female driver panicked and backed over one of the bicycles.  According to Hubert, the driver "backed out, kind of pulled the bike, she guns it, pulls the bike with her, bike shoots up under the car.  She gets away."

The car's back tires were getting out of the driveway when Hubert came running out.  He yelled at the driver and McKee-Salazar to stop.  McKee-Salazar stopped, but the car continued to pull away.  Hubert ran up to the passenger side and started to pound on the window and scream.

The driver shifted the car into drive while Hubert was yelling at her.  The car then "jolted forward very fast."  Hubert, who was holding onto the door handle, was dragged a

2

bit before the car drove off, knocking him down.  He sustained injuries to his hands and knees as a result of the encounter.

Hubert got up and apprehended McKee-Salazar.  She told Hubert that she tried to get the driver to stop, and that the driver was taking the car to Tennessee.  Hubert's girlfriend came out and called 911.  She then talked to McKee-Salazar, who clarified that the driver was taking the car to Tennessee Street in Woodland.  Hubert held McKee-Salazar until the police arrived.

Woodland Police Officer Ruben Esquibel arrived at Hubert's home about five minutes after being dispatched at 6:05 a.m.  He found McKee-Salazar sitting on Hubert's driveway near two backpacks.  Officer Esquibel had prior contacts with McKee-Salazar, and had previously seen her with defendant.  There was a bicycle in the driveway and another in front of the sidewalk by the house.  The bicycle in the driveway was similar to one he had seen defendant riding the week before.

McKee-Salazar told Officer Esquibel that she and another person were riding their bikes when she noticed a vehicle running in the driveway.  She told the other person that "if they took the car, I would drive it out.  I would drive it once it was out of the driveway."  She also told Officer Esquibel that the white bicycle was hers.

Police found Hubert's car around 6:06 a.m., around a quarter of a mile away from Hubert's home.  Woodland Police Sergeant Dallas Hyde had been dispatched to Hubert's home, but started looking for suspects in the area after learning that the car had been found.

Sergeant Hyde found defendant walking on the street, about half a mile from where Hubert's car had been found.  Defendant was wearing shorts and a sweatshirt.  Sergeant Hyde recognized defendant from prior contacts, and knew that she usually rode a blue BMX bicycle.  He executed a stop on her.

Defendant was sweating even though it was 49 degrees outside.  Sergeant Hyde asked her where she had come from.  Defendant replied that she had been "hanging out"

3

with her "home girl" about 25 minutes ago. She told the officer that she had just awakened after falling asleep behind a business down the street.

Defendant became angry after Sergeant Hyde confronted her about her inconsistent statements. He then put defendant into his patrol car and took her to Hubert's home. When they arrived, he saw a bicycle of the same make, model, and color as defendant's.

McKee-Salazar gave a statement to Sergeant Hyde. She told him: "I was riding my bike with another person, myself and another person saw the victim's car running. The other person told me to take the car. I told the other person I would drive the car after it was taken, but did not want to take it from the driveway." Asked the name of the other person, McKee-Salazar gave the names Serena and Marina and another name. Sergeant Hyde also heard defendant tell another officer that one of the bicycles was hers.

## DISCUSSION

Defendant contends there is insufficient evidence to support her conviction for robbery. We disagree.

In determining the sufficiency of the evidence, we ask whether " 'after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (*People v. Hatch* (2000) 22 Cal.4th 260, 272, italics omitted.) We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence. (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206.)

"Robbery is the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear." (§ 211.)

"To be convicted of robbery, the perpetrator must intend to deprive the victim of the property permanently. [Citations.] Robbery requires the 'intent to steal . . . either before or during the commission of the act of force.' [Citation.]" (*People v. Huggins*

4

(2006) 38 Cal.4th 175, 214.) "An intent to *temporarily* deprive the owner of possession may suffice when the defendant intends 'to take the property for so extended a period as to deprive the owner of a major portion of its value or enjoyment . . . .' [Citation.]" (*People v. MacArthur* (2006) 142 Cal.App.4th 275, 280.)

Defendant argues that her robbery conviction cannot stand because there is no evidence that she intended to steal the car. According to defendant, the evidence shows she intended no more than a temporary taking of Hubert's car.

"Although an intent to steal may ordinarily be inferred when one person takes the property of another, particularly if he takes it by force, proof of the existence of a state of mind incompatible with an intent to steal precludes a finding of either theft or robbery." (*People v. Butler* (1967) 65 Cal.2d 569, 573, disapproved on other grounds in *People v. Tufunga* (1999) 21 Cal.4th 935, 938-939.) "Evidence of a defendant's state of mind is almost inevitably circumstantial, but circumstantial evidence is as sufficient as direct evidence to support a conviction. [Citations.]" (*People v. Bloom* (1989) 48 Cal.3d 1194, 1208.)

While defendant did abandon the car a short distance from the theft, this does not support defendant's contentions. *People v. DeLeon* (1982) 138 Cal.App.3d 602 (*DeLeon*) is instructive. In *DeLeon*, the defendant, the driver, and his two passengers got into an altercation with the driver of another car. (*Id.* at pp. 604-605.) The defendant and his passengers used force to get the other car; the defendant and one passenger drove off in his car, while the other passenger drove off in the victim's car. (*Id.* at p. 605.) The victim's car was found by police less than a mile away and within an hour of the incident. (*Ibid.*) The victim was a dealer in gold and silver coins. (*Id.* at p. 604.) Diamonds, silver coins, and gold coins totaling $37,781 were taken from the abandoned car. (*Id.* at p. 605.)

On appeal, the defendant attacked his conviction for robbery of the car, contending that there was insufficient evidence of an intent "to deprive the owner permanently of the

5

car." (*DeLeon*, *supra*, 138 Cal.App.3d at p. 606.) The Court of Appeal rejected the claim. "The fact that the car was subsequently abandoned does not compel the conclusion that appellants intended to deprive the owner of the car only temporarily. Appellants' intent was to be inferred from circumstances and was a question of fact for the jury to decide. [Citation.] The jury might reasonably conclude, for example, that appellants intended to deprive the owner permanently of the car, but after discovering the valuable coins inside appellants concluded that they had better abandon the car as quickly as possible because the police would not treat this as a routine car theft. Giving all reasonable inferences in favor of the judgment, substantial evidence supports a conviction of robbery for taking the car by force." (*Ibid.*)

Viewed in the light most favorable to the verdict, the evidence here shows defendant intended to take the car permanently rather than using it as a means for temporary transportation. McKee-Salazar's statements show that she and defendant formed a plan to take Hubert's car as it was idling in the driveway, with defendant driving the car out of the driveway and then McKee-Salazar taking over. Defendant and McKee-Salazar decided to leave their backpacks and bicycles behind; when Hubert confronted them, defendant was backing the car out of the driveway as McKee-Salazar was trying to get in while the bicycles and backpacks were left on the driveway. The planning, the abandonment of their normal means of transportation, and the use of force to take the car are all consistent with an intent to permanently deprive Hubert of his car.

As in *DeLeon*, defendant's decision to abandon the car is consistent with a change in plans rather than negating any inference of an intent to steal. Hubert's intervention disrupted defendant and McKee-Salazar's plan by preventing McKee-Salazar from joining defendant in the car, where she was supposed to take over as the driver. The abandonment of the car is thus consistent with defendant intending to steal it but later deciding to abandon it because, after seeing McKee-Salazar detained by Hubert, she wished to avoid being tied to the robbery. This inference is supported by the

6

circumstances surrounding the car's abandonment. Not long after the incident was reported to the police, defendant was found sweating about half a mile away from the abandoned car. This is consistent with defendant not intending to take the car temporarily for transport to a location, but instead abandoning it and attempting to put as much distance as possible between herself and the car so to avoid being tied to the robbery, carjacking, and vehicle theft.

Since there is substantial evidence of an intent to steal, substantial evidence supports defendant's robbery conviction.

## DISPOSITION

The judgment is affirmed.


                                                 /s/
                                                 Blease, Acting P. J.


We concur:


     /s/
Butz, J.


     /s/
Renner, J.

7