Filed 12/2/20  P. v. Moore CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>    v.<br><br>KENNITH MOORE,<br><br>        Defendant and Appellant. | B298559<br><br>Los Angeles County<br>Super. Ct. No. NA110625 |

APPEAL from a judgment of the Superior Court of Los Angeles County, Laura L. Laesecke, Judge.  Affirmed.

Christine Dubois, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, David E. Madeo and Noah P. Hill, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted defendant and appellant Kennith Moore of two counts of robbery.  The jury found true an allegation that Moore used a knife in the commission of the crimes.  On appeal, Moore contends the trial court was required to instruct the jury on theft as a lesser offense of robbery, because he "abandoned" the items he had stolen from the grocery store before he produced a knife and waved it at store employees who had asked him to give back the merchandise.  We disagree and therefore affirm Moore's conviction.

## FACTS AND PROCEDURAL BACKGROUND

1. ***Moore takes items from a grocery store then waves a knife at store employees***

On November 4, 2018, around 4:30 p.m., Timothy Thomas was working as a security guard at the Superior Warehouse in Long Beach.  Thomas was standing outside the front of the store.  A store employee told Thomas a customer was shoplifting.  Thomas notified the manager, Saul Rodriguez, then "engaged the customer"—later identified as Moore—and asked him if he had "a receipt or 'How can I help you?' "

Moore told Thomas "the merchandise he had was his."  Then Moore said, "[L]eave me the fuck alone."  In the meantime, Rodriguez came outside.  He asked Thomas if he'd seen anyone "walking out with stuff."  Thomas pointed out Moore, who was standing at the bicycle rack.  Moore was wearing a "really big" jacket and Rodriguez "noticed that he had something."  Thomas could see a six-pack of beer in Moore's jacket.

Rodriguez told Moore, " 'Hey, just give me what you have.' "  Moore was "kind of like aggressive"; it seemed he just "want[ed] to go."  When Moore "tried to grab his bicycle," "all the things that he had in his body started falling down."  Moore started walking toward the sidewalk on Long Beach Boulevard, then "just pulled out a knife" from his right jacket pocket.  Moore

2

extended his arm and moved the knife back and forth from side to side. Items—including raw meat and rotisserie chicken—were dropping from Moore's jacket.

Thomas told Rodriguez to call the police and Rodriguez did. Rodriguez's 911 call was played for the jury at trial. Rodriguez told the dispatcher, "[W]e have stopped a guy and he has a knife and he was attacking us."

Thomas thought Moore was going to "get his bike and leave" but Moore started walking toward Thomas. Moore "pulled out his knife a second time." In the 911 call, Rodriguez told the dispatcher, "[H]e's coming back with the knife. Look! He's coming back." Rodriguez then said, "Hey! Hey! Watch out man!" and "Hey! Stop!"

Moore got on his bike and began to ride it. Thomas "grabbed [Moore] from behind." Thomas was able to get the knife and "toss[ ] [it] to the side." Rodriguez put his foot on the knife. Surveillance footage from a store camera—shown to the jury at trial—recorded the next four minutes or so. We have watched the footage.

Moore enters the screen from the bottom left-hand corner, riding his bike. Thomas grabs him from behind. Items fly from Moore and land on the pavement. One item appears to be full of liquid: it breaks and clear liquid runs down the pavement toward the parking lot. (This is likely one of the three bottles of Ketel One vodka that officers later found in Moore's possession. Moore is seen minutes later picking up a broken glass bottle off the ground.)

Moore and Thomas struggle on the pavement. Another man arrives and tries to help Thomas. After about two minutes of struggle, Moore stands up. Thomas is off to the right side of the screen. Moore picks a few items up from the pavement, takes his bicycle, then leaves the bicycle and walks away.

Thomas never was able to handcuff Moore.  After the scuffle, Moore made off with the handcuffs.  Thomas sustained a cut to his right hand from the broken bottle during the altercation with Moore.

Long Beach Police Officer Juan Ortiz was called to the area.  Ortiz saw Moore sitting on a bus bench.  A passerby flagged Ortiz down and told him "the guy [who] ran from security at the Superior" was "sitting right over there."  Moore matched the description Ortiz had been given of the robbery suspect.  Moore made eye contact with Ortiz, immediately got up, started walking away at a fast pace, and ran up an alley and then around a corner.  Eventually Ortiz was able to "detain" Moore.  Both Rodriguez and Thomas identified Moore in a field show-up.

Officers found cooked chicken "along" the main entrance to the store and raw chicken lying on the nearby sidewalk.  In a bag Moore was carrying, Ortiz found two bottles of Ketel One vodka, a third vodka bottle that was broken and empty, frozen French fries, candy, and cookies.  Officers took the items back to the store.  Rodriguez identified some of them as merchandise from his store.

At trial, the prosecutor introduced photographs of pieces of raw meat and of a knife lying on the pavement.

Jurors were shown video surveillance from cameras inside the store.  We have watched the footage.  The video—totaling just over four minutes—is not one continuous recording but eight clips from different areas and aisles of the store.

In the first clip, a man enters the store wearing a zippered jacket, zipped about halfway up, and carrying two bags, a dark blue bag and what appears to be a white plastic grocery bag.  At trial, Moore admitted that man was him.  The second clip is of the meat aisle.  Moore puts both bags down, picks up a package from the open refrigerated case, and uses his left hand to open

4

his jacket.  He places the package inside his jacket with his right hand, then adjusts his jacket as he walks toward the camera.

In the third clip, Moore opens the door of a refrigerated case and takes out what appears to be a half gallon of milk in a plastic container.  In the fourth clip, Moore walks toward the camera, still holding the milk, then leans forward and puts the milk container into his jacket on the left side by reaching in from the top with his right hand.

In the fifth clip, Moore picks up a red rectangular item.  He walks toward the camera, then steps to his right.  A large poster or display obscures the camera's view of him.  When he emerges from behind the poster, there is no sign of the red item.  Moore adjusts his now-bulging jacket.

In the sixth clip, Moore stops and puts both bags down.  He adjusts his jacket, pulling the bottom of it over a large bulge in his stomach area, especially to the left side.

In the seventh clip, Moore walks between cashiers' stations, bypassing them, walking toward the camera.  In the eighth clip, Moore leaves the store.

## 2. *The charges, trial, verdicts, and sentence*

The People charged Moore with two counts of second degree robbery, alleging Moore took property from Thomas and Rodriguez.  As to both counts, the People alleged Moore personally used a deadly and dangerous weapon:  a knife.  Before the preliminary hearing, Moore made a motion under *Faretta v. California* (1975) 422 U.S. 806 to represent himself.  The court granted the motion.  After Moore was held to answer, he successfully renewed his *Faretta* motion at arraignment in the superior court.

The case went to trial in May 2019.  Moore testified on his own behalf.  The court permitted Moore to testify in a narrative.

Moore told the jury he had bought candy, cookies, potatoes, and socks from the 99 cent store that day.  Moore then stopped at the Superior Warehouse to buy steaks.  Moore testified, "When I went through some aisles, I guess I picked something up.  When I picked something up, my intention was not to walk out of that store with those items.  Something got me sidetracked.  But I did because my hands were so full, I put the stuff on me."  Moore had not picked up a shopping cart when he entered the store.

Moore left the store.  When he got to his bike—which was either 60 yards or 120 feet from the exit[1]—Thomas approached him and asked him if he had a receipt.  Moore said Thomas "immediately tried to snatch my property and me."  Moore told the jury he called Thomas "a fag."  Moore testified he planned to ride away on his bike but a car almost hit him.  Moore said Thomas knocked him off his bike.  Moore claimed he suffered a broken hand.  Moore testified his bike was damaged and so he "limped away."  He said 10 or 15 police cars arrived and he "thought I was going to lose my life right there."

On cross-examination, Moore admitted he is the man seen in the in-store surveillance video and that he had put something from the meat section as well as a container of milk in his jacket.  Moore said he didn't recall what the meat item was.  When the prosecutor pointed out in the video "a very large bulge on the left side of [Moore's] jacket" and asked "what items are creating that bulge?," Moore responded, "I don't know."

Moore admitted the video shows him walking past the cash registers and leaving the store.  Then he stated he paid for "some cookies" and "one pack of meat."  When asked if he had paid for

---

[1]     Moore gave both distances in his testimony.

the milk he had put in his jacket, he answered, "I didn't have no milk." Moore claimed his receipt was in the white bag.

Moore testified that no items ever fell from his jacket. Moore denied ever having pulled out a knife.

Before opening statements, the court gave both the prosecutor and Moore copies of proposed jury instructions. The court encouraged Moore to read the proposed instructions, and offered to loan him copies of the CALJIC instruction books. The court told Moore he "might want to look up the term, 'lesser-included offense.'" The court explained that, "contained within robbery, there is theft." The court told Moore, "There are only certain times that I can give that theft instruction when you have been charged with robbery. And right now, I don't know if that applies. I won't know until I listen."

The court continued, "Nothing that I know about right now, though, would cause me to give it. But if you're going to develop that, you're going to somehow want that instruction, then you need to be familiar with it and make sure you ask the right questions so that I can give you that instruction that you're entitled to." Moore said he understood and had no questions about what the court had just said.

Four days later, the court asked Moore if he had "any issues" with the jury instructions. He said he did not.

The court instructed the jury with CALJIC Nos. 9.40 (Robbery), 9.40.2 (Robbery—After Acquired Intent), 9.40.3 (Store Employee as Victim of Robbery), 9.41 (Robbery—Fear—Defined), and 9.43 (Second Degree Robbery as a Matter of Law). The court did not instruct on theft as a lesser included offense.

In his closing argument, Moore told the jury he had a knife in his pocket and it fell out of his pocket when he "got struck from behind." Moore stated, "You cannot prove a knife was struck or used against Timothy Thomas or Saul Rodriguez." Moore said

7

Thomas and Rodriguez "falsified the police report, they falsified a printed receipt, and they falsified evidence."

The jury convicted Moore on both counts and found the weapon allegation true as to both. The court sentenced Moore to seven years and four months in the state prison. The court chose the upper term of five years on one of the robbery counts plus one year as one-third the midterm on the second count, plus one year plus four months (one-third the midterm) for the weapon enhancements.

## DISCUSSION

Penal Code section 211 defines robbery as the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear. (*People v. Gomez* (2008) 43 Cal.4th 249, 254 (*Gomez*).) Robbery is, therefore, a species of aggravated larceny. (*Ibid*.)

Robbery "includes two phases: acquiring the property, and carrying it away (in the parlance of legalese: caption and asportation)." (*People v. Robins* (2020) 44 Cal.App.5th 413, 418 (*Robins*).) In California, robbery is a continuing offense that begins from the time of the original taking and lasts until the robber reaches a place of relative safety. (*People v. Anderson* (2011) 51 Cal.4th 989, 994.)

The type of robbery at issue here is an *Estes* robbery, named for *People v. Estes* (1983) 147 Cal.App.3d 23 (*Estes*). "What sets an *Estes* robbery apart from a standard robbery is that the force or fear is used not in the acquisition of the property, but in the escape." (*Robins, supra,* 44 Cal.App.5th at p. 419.) "The typical case starts with a shoplifting and turns into a robbery when the thief is confronted by a [loss prevention officer], and the thief assaults the [officer] in an attempt to get away." (*Ibid*.)

8

The facts in *Estes* were nearly identical to ours. There, a store security guard saw Estes take clothing from a rack, put it on, and leave the store without paying. The guard followed Estes outside and confronted him. Estes refused to return to the store and began walking away. When the guard tried to detain him, Estes pulled out a knife and swung it at the guard. (*Estes, supra*, 147 Cal.App.3d at p. 26; see also *Gomez, supra*, 43 Cal.4th at p. 258.) The court of appeal held Estes's use of force to prevent the guard from retaking the property and to facilitate his escape was sufficient to support his conviction for robbery. (*Gomez*, at p. 258.)

Moore does not dispute this governing law. Instead—having testified under oath at trial that no items ever fell from his jacket during his interaction with Rodriguez and Thomas—he now contends that any and all items he stole from the store had fallen out of his jacket before he pulled out his knife and pointed it at the store employees. Moore asserts he had "dropped and abandoned the items he had unlawfully taken" from the store before he "menac[ed] [Rodriguez and Thomas] with his knife." Accordingly, Moore argues, the trial court was required sua sponte to instruct the jury on theft as a lesser included offense of robbery.

A trial court must—even in the absence of a request—instruct the jury on all general principles of law relevant to the issues raised by the evidence. (*People v. Breverman* (1998) 19 Cal.4th 142, 154.) The general principles of law governing the case are those principles closely and openly connected with the facts before the court, and that are necessary for the jury's understanding of the case. (*People v. St. Martin* (1970) 1 Cal.3d 524, 531.) However, the court is required to give a particular instruction sua sponte only if there is substantial evidence from which a jury composed of reasonable people could find

9

true the facts underlying the instruction. (*Breverman,* at p. 162.) A sua sponte duty to instruct does not arise from the existence of any evidence, no matter how weak. (*Ibid.*)

The determination whether sufficient evidence supports an instruction must be made without reference to the credibility of that evidence. (*People v. Salas* (2006) 37 Cal.4th 967, 982.) Doubt as to the sufficiency of the evidence to warrant a particular instruction should be resolved in the defendant's favor. (*People v. Tufunga* (1999) 21 Cal.4th 935, 944.) However, the court need not give instructions based solely on conjecture and speculation. (*People v. Day* (1981) 117 Cal.App.3d 932, 936.)

Moore contends the evidence showed he took only meat from the store, and he dropped it "before confronting the employees with a knife." The record does not support that contention.

The in-store surveillance video shows Moore taking a package from the meat case and a container of milk from the refrigerator.[2] The video is a collection of clips; there was no testimony that the footage contains everywhere Moore went and everything he did within the store. For example, rotisserie chicken was found on the sidewalk but the video doesn't show Moore taking chicken inside the store.

---

[2] Moore says in his brief he "put the milk . . . back before leaving the store" but the page he cites from the reporter's transcript doesn't say that. The prosecutor asked Moore, "Did you pay for the milk?" Moore responded, "I didn't have no milk." The prosecutor began, "The carton of milk that we saw you grab and put into your jacket—." Moore interrupted, "I did not have—." The prosecutor continued, "Did you purchase the milk?" Moore answered, "No, I didn't."

Moreover, by the time Moore left the store, his jacket had a very large bulge—much larger than one package of meat and a half gallon of milk would cause. While showing Moore the video on cross-examination, the prosecutor asked Moore—just after the "red package" clip—"how many items do you have in your jacket at that point?" Moore responded, "I don't know." He did not say "two," or "one."

The surveillance video of the area just outside the exit does not contain Moore's interaction with Rodriguez and Thomas before Moore got on his bicycle to leave. There is no video of Moore's display of the knife, which happened before Moore got on the bike. There is no video that shows what items fell from Moore's jacket or when they fell in the sequence of events. Rodriguez testified items had fallen from Moore's jacket before he pulled out the knife the first time, but the second time Moore displayed the knife was after items had fallen.

Thomas testified he saw "some beer bottles" in Moore's jacket when he first encountered him outside the store. When Thomas grabbed Moore, after Moore had twice displayed the knife, things fell and at least one glass container broke on the ground. When apprehended a short time later, Moore had two unopened bottles of vodka in his bag as well as a broken vodka bottle. On appeal, Moore asserts he had purchased that alcohol elsewhere. But Moore never testified to that at trial, even though given ample opportunity to tell his story in narrative form.

Moore testified he had bought candy, cookies, potatoes, and socks at the 99 cent store. He made no mention of buying vodka, there or anywhere else. The jury reasonably could assume that

11

the dollar store does not sell Ketel One vodka for 99 cents.[3] Nor was Moore's testimony on this point consistent. He first said three bottles of alcohol were in his blue bag. Then he testified "all of the glass" was in the white bag and he was "laying in the liquor" from the white bag after Thomas grabbed him.

Moreover, as the Attorney General notes, Moore did not voluntarily relinquish or "abandon[ ]" whatever items fell from his jacket in any event. The meat, chicken, and bottle of vodka fell despite Moore's efforts to keep possession of them. (See *People v. Torres* (1996) 43 Cal.App.4th 1073, 1077, 1079, disapproved on other grounds in *People v. Mosby* (2004) 33 Cal.4th 353, 365, fn. 3 [no duty to instruct on theft as lesser to robbery where defendant, while holding radio he'd removed from victim's car, swung screwdriver at victim's companion; even though defendant then placed radio on victim's car seat, he had used screwdriver to keep possession of victim's property]; cf. *People v. Pham* (1993) 15 Cal.App.4th 61, 64, 67-68 [no duty to instruct on attempted robbery where victim chased defendant to stop his escape and defendant dropped victim's property and slugged victim in the head; defendant had not "truly abandoned" victim's property before using force].)

Moore relies on *People v. Hodges* (2013) 213 Cal.App.4th 531. That case does not assist him. *Hodges* involved a trial court's response to a jury question. Hodges had shoplifted some items from a grocery store. Security guards followed him to his car and demanded he come back inside. Hodges offered to give the merchandise back. The guards refused the offer, insisting Hodges return to the store. Hodges threw the items at a guard,

---

[3]    Indeed, an exhibit Moore himself introduced shows the two bottles of Ketel One vodka found in his possession when Ortiz detained him rang up at $34.98 and $19.99 respectively.

hitting him in the face or chest.  As Hodges then tried to drive away, a guard reached into his car in an attempt to grab his keys and was dragged some distance.  (*Hodges*, at pp. 535-536.)  The appellate court held the trial court had erred in its response to a jury question about the sequence of these events because the evidence was susceptible to a conclusion that Hodges's theft of the merchandise ceased after he no longer had the intent to keep the store's property.  (*Id.* at pp. 538, 543.)  Here, by contrast, there is no evidence Moore sought to return or relinquish the items he'd stolen, before he waved his knife at the employees or—for that matter—at any time.

In sum, there was no substantial evidence that Moore's intent to keep and carry away the Superior Warehouse's property ever ceased or that he intentionally dropped or abandoned the stolen items.  The trial court had no obligation to instruct on theft as a lesser offense to robbery.

## DISPOSITION

We affirm Kennith Moore's judgment of conviction.


**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**



EGERTON, J.

We concur:



EDMON, P.J.                                    LAVIN, J.

13